UNITED STATES, Appellee,

v.

Robert J. MONROE, Staff Sergeant,
U.S. Air Force, Appellant.

No. 99–0536.
Crim.App. No. 32592.

U.S. Court of Appeals for
the Armed Forces.

Argued* Nov. 9, 1999.

Decided March 13, 2000.

---

* We heard oral argument in this case at the Catholic University of America Columbus School of Law, Washington, D.C., without objection from the parties involved. *See* 38 MJ at 137 n.l.

MAYER, Circuit Judge, delivered the opinion of the Court, in which CRAWFORD, C.J., and SULLIVAN, GIERKE, and EF-FRON, JJ., joined.

For Appellant: *Major Thomas R. Uiselt* (argued); *Colonel Jeanne M. Rueth* (on brief); *Major Margo Stone Newton.*

For Appellee: *Captain Tony R. Roberts* (argued); *Colonel Anthony P. Dattilo, Lieutenant Colonel Ronald A. Rodgers,* and *Lieutenant Colonel William B. Smith (USAFR)* (on brief); *Captain Christa A. Specht.*

Amicus Curiae Urging Reversal: First Lieutenant Griffin Mealhow (USAR) (argued); David Bundy and Ensign Thomas Street (USNR) (on brief); Ensign Wade Callender (USNR) (all Third–Year Law Students)—For the Catholic University of America Columbus School of Law.

Circuit Judge MAYER delivered the opinion of the Court: [1]

In the fall of 1995, an electronic mail host (EMH) resided on a computer owned by the

---

1. Chief Judge Haldane Robert Mayer of the Unit-   ed States Court of Appeals for the Federal Cir-

United States Air Force at Osan Air Base, Korea, which allowed a user, through a log-on and a private password, to access the Defense Data Network and the Internet. Accounts were available for official business, although users were allowed to use them to send and receive limited textual and morale messages to and from friends and family. Each time a user logged on to the EMH at Osan, he received a banner message stating, "USERS LOGGING ONTO THIS SYSTEM CONSENT TO MONITORING BY THE HOSTADM." In-coming e-mail messages were normally sent to the MQUEUE directory on the EMH, where they would be read, sorted, and sent to the recipient's e-mail account by a computer program approximately every 15 minutes. Messages which were defective or too large might not be sent, and would accumulate in the directory, where they should have been deleted automatically after 72 hours. On the occasions software errors prevented this automatic deletion, the EMH system was slowed considerably.

During the time at issue, Staff Sergeant Brian Carlson was the EMH administrator, and Staff Sergeant Daniel Hatcher was the base-wide area network administrator. On November 29, 1995, Carlson found that 59 messages had been stuck in the MQUEUE directory for over 72 hours, some for up to ten days. In an effort to identify the source of the problem, Carlson and Hatcher opened several of the messages. They looked at the header of some of the messages and found that they were addressed to a user known as "monroer." They also noticed that the messages were sent from newsgroups with such sexually oriented names as "erotica" and "sex." "[M]onroer" was later found to be the account name of appellant, Staff Sergeant Robert J. Monroe.

To determine why the 59 files did not process and to clear them from the system, Hatcher had the messages moved to a directory outside the MQUEUE. He determined that 33 of the messages contained graphic image files. He transferred the image files

to a separate computer, opened a few of them in a continuing effort to determine the cause of the system problem, and discovered they contained sexually explicit photographs of adult women.

Hatcher then sought to find out whether this material had been requested or whether Monroe had been the victim of a prank. To do this, Carlson and Hatcher opened Monroe's e-mail account. They found one message he sent to "wsnet.com," the sender of the 59 files in question, reminding them to "send the file." They also found a message giving instructions on how to access material and containing a listing of newsgroups with such names as "Lesbians," "Girlfriends," "Lingerie," and "Great Ass Paulina." Convinced that Monroe had not been the victim of a prank, on November 30, 1995, Hatcher decided to report the matter. He turned over to Special Agent Dewayne Duff of the Air Force Office of Special Investigations (OSI) two diskettes which contained 33 image files, the printouts of the two messages found in the accused's e-mail account, and a memorandum for record discussing how he came to discover these files.

Hatcher found twelve additional messages stuck in the MQUEUE directory on December 6, 1995. Four were directed to Monroe and eight were directed to a library account. Hatcher opened the message headers and found that they were from the same sexually oriented newsgroups as the earlier messages. These were turned over to Duff on December 8, 1995.

On December 11, 1995, Duff took a copy of the original images to Captain Taylor, Chief of Military Justice at Osan Air Base, and Lieutenant Colonel Wise, the Staff Judge Advocate. They viewed the images and decided that an OSI investigation was appropriate. The same day, Duff received a memorandum for record from Monroe's first sergeant, Master Sergeant Wilburn, indicating that Monroe had an e-mail account set up and that he believed he had a computer system.

cuit, sitting by designation pursuant to Article 142(f), Uniform Code of Military Justice, 10 USC

§ 942(f).

On December 12, 1995, Duff obtained a verbal authorization from Colonel James Green, the base search authority, to search the building where Monroe worked. The search authorization was never used when it became apparent that he did not have access to any government computers at his work site capable of receiving electronic mail transfers. On December 18, 1995, Duff spoke with Wilburn, who told him he believed Monroe had a computer in his dorm room. Wilburn based this belief on statements by Monroe that he was working on his computer.

Duff briefed Taylor on the status of the investigation on December 19, 1995, and she said that probable cause existed to seize all computer-data media within Monroe's control in his dormitory room. Duff signed an affidavit describing the image files as "graphic pornographic photographs" and relaying the circumstances of their discovery, the statement of Wilburn, and Taylor's opinion that probable cause existed. Based on this affidavit, Green signed an AF Form 1176 authorizing a search of Monroe's quarters and the seizure of "all computer related data media suspected to contain pornography or child pornography." No child pornography had yet been found. On December 21, 1995, OSI searched Monroe's dormitory room. All computer or computer related items, including all hardware and software, 218 floppy disks, eight pages of travel voucher documents with writing on them and two pages of notes were seized. During the search of Monroes dormitory, a large quantity of computergraphics files was seized along with one text file. A stipulation of fact was later entered into by Monroe and the Government in which he admitted that three of the seized graphics files depicted minors engaged in sexually explicit conduct, that a number of the images were obscene as legally defined, and that the text file was obscene as legally defined.

Monroe moved to suppress both the initial e-mail messages and attached image files and all of the materials seized during the December 21, 1995 search of the dormitory room as violating his rights under the Fourth Amendment of the Constitution. He argued that Carlson and Hatcher performed an illegal search when they opened the files and e-mail messages that had become stuck in the MQUEUE directory, and that Green's authorization of the search of Monroe's dormitory room was not based on probable cause. The military judge denied the motion to suppress because he concluded that Hatcher and Carlson had not performed an unlawful search, all of their actions were for a legitimate government purpose pursuant to their duties, and at no time did they act as government agents under Mil.R.Evid. 311(c), Manual for Courts–Martial, United States (1995 ed.).[2] The military judge additionally held that in light of the totality of the circumstances, Green had issued the search authorization based on probable cause for Fourth Amendment purposes. Alternately, he said the evidence from the search of the dormitory room was admissible under the good faith exception of Mil.R.Evid. 311(b)(3).

Monroe entered conditional pleas of guilty to preserve his right to appeal the suppression motion. He was convicted by a general court-martial of violating a lawful general order, wrongfully and knowingly possessing three or more visual depictions of minors engaged in sexually explicit conduct, in violation of 18 USC § 2252(a), and using a common carrier to transmit and receive, via interstate and foreign commerce, obscene writings and computer graphics, in violation of 18 USC § 1462.

The Air Force Court of Criminal Appeals concluded that the trial judge properly denied the motion to suppress because Monroe had no reasonable expectation of privacy in the messages that had become lodged in the MQUEUE directory or in his e-mail box, "at least as regards his superiors and the EMH administrator and his/her superiors." *United States v. Monroe*, 50 MJ 550, 559 (A.F.Ct. Crim.App.1999). That court also held that even if there had been a reasonable expectation of privacy, it would not have applied under these circumstances because Monroe had exceeded the scope of authorized person-

**2.** All Manual provisions are cited to the version applicable at trial.

al use and Hatcher and Carlson were well within the scope of their official duties. *Id.* at 559–60. The search of Monroe's dormitory room was similarly sustained because Green had a substantial basis for finding probable cause for the search, and the good faith exception would apply if there had been some deficiency in the search authorization. *Id.* at 561. This appeal followed.

### Issue

WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE.

■ We review a military judge's ruling on a motion to suppress for abuse of discretion. *United States v. Ayala,* 43 MJ 296, 298 (1995). "[W]e review factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard." *Id.* (citations omitted). "In reviewing a ruling on a motion to suppress, we consider the evidence 'in the light most favorable to the' prevailing party." *United States v. Reister,* 44 MJ 409, 413 (1996).

Because Monroe challenges the legality of both Hatcher and Carlson opening the messages stuck in the MQUEUE directory and his e-mail box, and Colonel Green's authorization of the search of his dormitory room, we will address the actions of Hatcher and Carlson and those of Colonel Green in turn.

### 1. Expectation of Privacy

■ A person may challenge the validity of a search only by asserting a subjective expectation of privacy which is objectively reasonable. *See Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990). "Whether a party has manifested a subjective expectation of privacy is a question of fact, reviewed under the clearly erroneous standard. Whether that subjective expectation is objectively reasonable is a matter of law subject to de novo review." *United States v. Maxwell,* 45 MJ 406, 417 (1996) (citations omitted).

In *Maxwell,* we gave extensive consideration to the nature of expectations of privacy pertaining to e-mail messages, in the context of a private, not a governmental, provider of electronic communications services. *Id.* We found a limited expectation of privacy in the messages sent or received on the appellant's America Online (AOL) account, observing that the "[e]xpectations of privacy in e-mail transmissions depend in large part on the type of e-mail involved and the intended recipient." *Id.* at 418–19. Important to our conclusion of a limited expectation of privacy were the facts that AOL stored e-mail messages for retrieval on AOL's centralized and privately-owned computers rather than on the Internet itself, and that AOL contractually agreed not to read or disclose subscribers' e-mail to anyone other than authorized users. *Id.* at 417.

■ In this case, the system was owned by the Government and instead of a contractual agreement not to read or disclose messages, there was a specific notice that "users logging on to this system consent to monitoring by the Hostadm." The transmitter of an e-mail message enjoys a reasonable expectation that police officials will not intercept the transmission without probable cause and a search warrant. *Id.* at 418. "However, once the transmissions are received by another person, the transmitter no longer controls its destiny." *Id.* As we said in *Maxwell,* "there is the risk that an employee or other person with direct access to the network service will access the e-mail...." *Id.* In fact, the provider of electronic communications service, in this case the Air Force through its employees Hatcher and Carlson, is specifically exempted from any statutory liability for unlawful access to stored electronic communications. *See* 18 USC § 2701(c)(1) (1999). Based on the totality of the circumstances, we conclude that Monroe had no reasonable expectation of privacy in his e-mail messages or e-mail box at least from the personnel charged with maintaining the EMH system. It therefore was not a search cognizable under the Fourth Amendment when Hatcher and Carlson opened Monroe's e-mail messages and subsequently opened his e-mail box.

■ Nor did Hatcher and Carlson act illegally in disclosing Monroe's e-mail messages to the OSI. Congress has differentiated be-

tween the treatment of the intercept of electronic communications, which is governed by the stringent requirements of 18 USC §§ 2511–21 (1999), and the access to stored electronic communications, which is governed by the less restrictive provisions of 18 USC §§ 2701–07 (1999). *See* David B. Walker, *Privacy in the Digital Age: Encryption Policy—A Call for Congressional Action,* 1999 Stan. Tech. L.Rev. 3, ¶¶ 3–12, <http://stlr.stanford.edu/STLR/Articles/99_STLR_3/index.htm>. Since all of the e-mail messages in this case were accessed from storage and not intercepted in transit, we need only concern ourselves with the requirements of 18 USC §§ 2701–07. The version of section 2702(b) in effect at the time of trial in 1995 specifically states that "[a] person ... may divulge the contents of a [stored electronic] communication ... (6) to a law enforcement agency, if such contents (A) were inadvertently obtained by the service provider; and (B) appear to pertain to the commission of a crime." 18 USC § 2702(b)(1994). Because Hatcher and Carlson opened the e-mail messages to determine the reason they were stuck in the MQUEUE directory and not for any law enforcement purpose, they inadvertently obtained the messages and the other e-mail messages gathered from Monroe's e-mail box while troubleshooting the problems the original messages had created within the EMH system.

### 2. Probable Cause

■ "In reviewing a decision that there was probable cause for a search, we must keep in mind that 'a determination of probable cause by a neutral and detached magistrate is entitled to substantial deference.'" *Maxwell,* 45 MJ at 423 (citing *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)); *cf. Ornelas v. United States,* 517 U.S. 690, 697–700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (holding no appellate deference due in warrantless-search cases); *see generally,* 2 Steven A. Childress and Martha S. Davis, *Federal Standards of Review* § 11.11 (3d ed.1999). The Supreme Court held in *Illinois v. Gates* that the Fourth Amendment probable cause

requirement for the issuance of a warrant is to be applied in light of the totality of the circumstances made known to the magistrate. 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 2085, 80 L.Ed.2d 721 (1984). "A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Id.* at 733, 104 S.Ct. at 2088. We have interpreted the Supreme Court's guidance to require that "resolution of doubtful or marginal cases ... should be largely determined by the preference ... [for] warrants.... [C]lose calls will be resolved in favor of sustaining the magistrate's decision." *Maxwell,* 45 MJ at 423 (citations omitted).

■ In this case, Colonel Green's determination of probable cause was based exclusively on Duff's affidavit; he stated that he most likely did not talk to Taylor directly because Duff's affidavit specifically stated her opinion on probable cause. As a result, we must consider whether the affidavit, standing alone, provided a substantial basis for Green to decide that probable cause existed to search Monroe's dormitory room.

■ Monroe challenges the affidavit as violating the Supreme Court's standard for seizing materials presumptively protected by the First Amendment because it contained only Duff's conclusory allegation that the photographs were obscene and provided no independent means for Green to determine if the photographs were, in fact, obscene. *See New York v. P.J. Video, Inc.,* 475 U.S. 868, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986). We reject these arguments. "[A]n application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." *Id.* at 875, 106 S.Ct. at 1615. The Supreme

**332**

Court has "never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure." *Id.* at 874 n. 5, 106 S.Ct. at 1614 n. 5. It is, nevertheless, true that the magistrate must be provided sufficient information to make an independent determination under the totality of the circumstances. *See Gates,* 462 U.S. at 239, 103 S.Ct. at 2332.

We agree with the military judge that photographs, unlike novels or films, speak for themselves without regard to context. It goes without saying that it would have been preferable for Duff to include exemplary image files in the affidavit or to give a more detailed description of what is depicted, but we are not tasked with making a *de novo* probable cause determination. The question now is whether a substantial basis existed for the determination that was in fact made. Colonel Green could have determined, and been equally reasonable, that probable cause did not exist to authorize the search; he did, however, find probable cause, and we cannot conclude that he did not have a sufficient basis for doing so. The phrase "graphic pornographic photographs" is not merely conclusory but, given its ordinary meaning, communicates to a reasonable person that the photographs in all probability depict obscenity as legally defined. This is a case of borderline sufficiency and should not be taken as a model for future conduct. *See Monroe,* 50 MJ at 561. But, "close calls will be resolved in favor of sustaining the magistrate's decision." *Maxwell,* 45 MJ at 423. We, therefore, conclude that the description of the photographs, coupled with the statements from Wilburn and Taylor included in the affidavit, provided a substantial basis for Green to find probable cause.

Even if Green's probable cause determination had lacked a substantial basis, the evidence seized would be admissible under the good faith exception of Mil.R.Evid. 311(b)(3).[3] *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule [to deter police misconduct]." *Id.* at 918, 104 S.Ct. at 3418. Suppression is particularly inappropriate "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920, 104 S.Ct. at 3419. Here, there is no suggestion on the record that Duff acted with anything less than objective good faith in seeking and executing the search authorization. He sought legal advice throughout his investigation including having Taylor personally review the subject images. The investigators showed appropriate restraint in not executing the search authorization for Monroe's work area when they discovered that he had no means to access the EMH system there. Duff fully disclosed the sources of his information, and there was no reason for Green to view Duff's affidavit as deficient on its face. There was no indication that Green wholly abandoned his judicial role, or that the authorization was facially deficient. *See id.* at 923, 104 S.Ct. at 3421. The good faith exception is fully applicable to this case, and the motion to suppress was properly denied even if there were some deficiency in the search authorization.

Accordingly, the decision of the United States Air Force Court of Criminal Appeals is affirmed.

---

**3.** Mil.R.Evid. 311(b)(3) provides that:
Evidence that was obtained as a result of an unlawful search or seizure may be used if:
(A) The search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under Mil.R.Evid. 315(d) or from a search warrant or arrest warrant issued by competent civilian authority;

(B) The individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and
(C) The officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith shall be determined on an objective standard.