UNITED STATES, Appellee

v.

David A. LEEDY, Airman First Class
U.S. Air Force, Appellant

No. 06-0567

Crim. App. No. 35939

United States Court of Appeals for the Armed Forces

Argued March 14, 2007

Decided June 22, 2007

BAKER, J., delivered the opinion of the Court, in which EFFRON, C.J., and STUCKY and RYAN, JJ., joined. ERDMANN, J., filed an opinion concurring in the result.

Counsel

For Appellant: Major John N. Page, III (argued); Lieutenant Colonel Mark R. Strickland and Captain Christopher S. Morgan (on brief).

For Appellee: Major Matthew Ward (argued); Colonel Gerald R. Bruce, Lieutenant Colonel Robert V. Combs, Major Kimani R. Eason, and Captain Jamie L. Mendelson (on brief); Colonel Gary F. Spencer.

Amicus Curiae for Appellant: Carey Scheible (law student) (argued); Robert B. Harper, Esq. (supervising attorney), Neal Hamilton (law student)(on brief) – for the University of Pittsburgh School of Law.


Military Judge: Dawn R. Eflein

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Leedy, No. 06-0567/AF

Judge BAKER delivered the opinion of the Court.

Appellant was an Airman First Class (A1C) assigned to Kunsan Air Base, Korea. Before a general court-martial composed of members Appellant pleaded not guilty to possessing and/or receiving child pornography in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Appellant was convicted and sentenced to a bad-conduct discharge, confinement for eight months, total forfeiture of all pay and allowances, and reduction to airman basic. The convening authority reduced the confinement to seven months and approved the remainder of the sentence. The Air Force Court of Criminal Appeals affirmed the findings and the sentence. United States v. Leedy, ACM 35939 (A.F. Ct. Crim. App. Feb. 28, 2006) (unpublished). Upon Appellant's petition we granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE EVIDENCE SEIZED FROM APPELLANT'S COMPUTER WHERE THE AFFIDAVIT IN SUPPORT OF THE SEARCH DID NOT CONTAIN ANY DESCRIPTION OF THE SUBSTANCE OF THE IMAGES SUSPECTED TO DEPICT "SEXUALLY EXPLICIT CONDUCT."[1]

The granted issue raises the question of when, if at all, can computer file titles, absent further description of file

---

[1] We heard oral argument in this case at the University of Pittsburgh School of Law, Pittsburgh Pennsylvania, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 326, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

contents, serve as probable cause to search for child pornography. We conclude that the military judge did not err in denying Appellant's motion to suppress. Admissible evidence must be obtained based upon a valid search authorization or, in the absence of such authorization, must be consistent with one of the recognized exceptions to the requirement. In this case, we find that the authorization was proper as there was a substantial basis for the issuing magistrate to conclude that there was a fair probability that evidence of child pornography would be found on Appellant's computer.

## BACKGROUND

While stationed at Kunsan Air Base, Appellant lived with a roommate, A1C Winkler. Both Appellant and A1C Winkler owned computers that were proximate to one another in their room. Appellant's computer was situated to preclude observation of the monitor by others in the room. On an occasion in January or February 2003, Appellant's computer was on while Appellant was not present. A screensaver activated on his computer was set to automatically disengage when the computer's mouse moved. While working on his computer, A1C Winkler bumped Appellant's computer. The screensaver disengaged and A1C Winkler subsequently observed a program running on Appellant's computer that he recognized as Windows Media Player, an application used to play digital audio and video files. The program was not

3

playing any files but did display a play list with titles of recently accessed files. These titles led A1C Winkler to believe that many of the files were sexually explicit; further, A1C Winkler felt that based on their titles at least one of the files likely depicted child pornography.

On March 14, 2003, at least one month later, A1C Winkler reported his suspicions to the base Air Force Office of Special Investigations (AFOSI) Detachment and was interviewed by the detachment commander, Special Agent (SA) Spring, and another investigator. Following the interview, the investigators took the information to the Chief of Military Justice at the base to discuss whether probable cause existed to authorize a search of Appellant's computer. The Chief of Military Justice felt that probable cause existed and the detachment commander prepared an affidavit requesting search authorization. The affidavit was presented on March 14, 2003, to the base military magistrate. The magistrate provided the authorization and a search was executed by AFOSI agents. Investigators searched Appellant's computer and found pornographic files (video clips and still photos), more than thirty of which depicted sexually explicit acts involving minors.

At trial, Appellant moved to suppress all evidence obtained as a result of the search of his computer. The military judge

held an Article 39(a)[2] session to litigate the matter, during which Appellant argued the magistrate did not have probable cause to issue the authorization.  Appellant contended that the probable cause standard was not met for several reasons:  A1C Winkler was unknown to AFOSI and had no track record of providing any information to the office; the only evidence A1C Winkler provided the magistrate was stale (over a month had elapsed between A1C Winkler seeing Appellant's files and his report to AFOSI); no one had ever seen any pornography of any sort on Appellant's computer; the sole direct link between Appellant and child pornography was the title of a file: "14 Year Old Filipino Girl"[3], and there was nothing in the title, nor in A1C Winkler's description of the other files, that necessarily suggested lasciviousness or portrayals of "sexually explicit conduct".  On appeal, Appellant also noted that the application Windows Media Player can play both video and audio files and there was nothing in the file titles provided by A1C Winkler that indicated that the potentially offending files were visual rather than audio (federal law only criminalizes "visual depiction" of child sex acts).  See 18 U.S.C. § 2252(a) (2000).

---

[2] UCMJ, 10 U.S.C. § 839(a) (2000).

[3] The affidavits and recorded testimony used various spellings of "Filipino" (including "Philipino"); we have used the preferred spelling of this adjective throughout this opinion but note that it refers to the same file discussed in the affidavits and testimony.

Further, the investigating officer made no effort to corroborate the informant's suspicions, or to provide the magistrate with examples of the pornography in question (which, Appellant argues, has regularly been required in such cases). The investigators also admitted that they had no evidence that Appellant exhibited any of the "characteristics" of those who possess child pornography.

Finally, Appellant argued that not only was the authorization inappropriate, the "good faith" exception to authorization was unavailable for two reasons. United States v. Leon, 468 U.S. 897 (1984); United States v. Carter, 54 M.J. 414 (C.A.A.F. 2001). First, the authorization was facially deficient, because it relied on a "bare bones" affidavit. See Carter, 54 M.J. at 422 (finding by implication that a bare bones affidavit is one in which, inter alia, sources of information are not identified, and conflicts and gaps in evidence are not acknowledged); United States v. Wilhelm, 80 F.3d 116, 121-22 (4th Cir. 1996) (reliance on affidavit unreasonable because magistrate acted as rubber stamp by approving "bare bones" affidavit based solely upon uncorroborated anonymous tip). Second, on appeal, Appellant argued that the magistrate did not perform his duties in a neutral and detached manner. Appellant contends that the magistrate misunderstood his role, which was to protect individual liberties, not, as the magistrate said in

the Article 39(a) hearing, to "make sure if we're accusing somebody that the evidence will be there."  According to Appellant, instead of undertaking the necessary critical examination of the facts, the magistrate chose simply to defer to the criminal investigator.

The Government demurred, arguing that even if the evidence presented did not create a certainty that contraband was to be found, under prevailing constitutional law enough was presented to the magistrate for him to make a proper determination of probable cause.  Under the totality of the circumstances there was a substantial basis upon which the magistrate could have found probable cause.  Moreover, the magistrate was properly detached and independent in his dealings with the AFOSI; the magistrate scrutinized the affidavit and questioned the investigator, raising the issue of the potential inaccuracy of the informant's suspicions, and his concern regarding the identity of the "14-year-old Filipino girl" file as legally "child pornography."

The military judge weighed these arguments and made the following factual findings.

> 1) A1C Winkler and Appellant were roommates and each had his own computer.  Appellant's computer was set up such that no one in the room would be able to see the monitor without being directly in front of the screen.
>
> 2) At some time in early to mid-February 2003 A1C Winkler accidentally bumped Appellant's computer,

7

deactivating Appellant's screensaver and revealing the contents of the computer's desktop.

3) A1C Winkler saw the Windows Media Player program open on the desktop and noticed that there were several file names listed in the player.
4) One file name that A1C Winkler remembers was "14 year old Filipino girl", and though A1C did not remember the name of any other files, he recalled that some mentioned ages and some mentioned acts. A1C Winkler became concerned that these files included child pornography.

5) On March 14, 2003, A1C Winkler reported his suspicions to the AFOSI.

Based on these facts, the military judge agreed with the magistrate's determination that "there was probable cause to believe that evidence . . . was reasonably likely to be found in the accused's . . . personal computer."

Both Government and Appellant made the same arguments before the Air Force Court of Criminal Appeals, which found that the "evidence presented to the magistrate was sufficient to permit a person of reasonable caution to conclude that contraband would be found on the appellant's computer." Leedy, ACM 35939.

Appellant renews his arguments before this Court. For the reasons stated below, we concur with the military judge and the lower court's conclusions and affirm.

DISCUSSION

We recognize that there are competing standards of review at play in this case. The specified issue refers to the denial

of a motion to suppress, a decision we review for an abuse of
discretion. United States v. Rader, 65 M.J. 30, 32 (C.A.A.F.
2007); United States v. Khamsouk, 57 M.J. 282, 286 (C.A.A.F.
2002). However, we review the legal question of sufficiency for
finding probable cause de novo using a totality of the
circumstances test. United States v. Reister, 44 M.J. 409, 413
(C.A.A.F. 1996) (holding that "[c]onclusions of law are reviewed
de novo . . ."). In turn, this determination is based in large
part on the facts found by the military judge, the review of
which we conduct under a "clearly erroneous" standard. Findings
of fact will not be overturned unless they are clearly erroneous
or unsupported by the record.[4] See United States v. Brisbane, 63
M.J. 106, 110 (C.A.A.F. 2006); United States v. Swift, 53 M.J.
439, 446 (C.A.A.F. 2000) (citing United States v. Ayala, 43 M.J.
296, 298 (C.A.A.F. 1995)); United States v. Moses, 45 M.J. 132,
135 (C.A.A.F. 1996)). Finally, our review is shaped by the
outcome of the trial below as we have held that "[i]n reviewing
a ruling on a motion to suppress, we consider the evidence 'in

---

[4] The clearly erroneous standard is a very high one to meet and
Appellant does not meet the burden by suggesting that the
findings are "maybe" or "probably wrong."[4] Parts & Electric
Motors, Inc. v. Sterling Electric, Inc., 866 F.2d 228, 233 (7th
Cir. 1988). If there is "some evidence" supporting the military
judge's findings we will not hold them "arbitrary, fanciful, or
clearly erroneous." United States v. McCollum, 56 M.J. 837, 843
(A.F. Ct. Crim. App. 2002). Indeed, here, we hold that "the
military judge's findings of fact are well within the range of
the evidence permitted under the clearly-erroneous standard."
United States v. Norris, 55 M.J. 209, 215 (C.A.A.F. 2001).

the light most favorable to the' prevailing party." Reister, 44 M.J. at 413; United States v. Flores, 64 M.J. 451, 454 (C.A.A.F. 2007).

We start by examining whether the magistrate had a "substantial basis" for determining that probable cause existed. Illinois v. Gates, 462 U.S. 213, 238 (1983). It follows that where a magistrate had a substantial basis to find probable cause, a military judge would not abuse his discretion in denying a motion to suppress.

The threshold for probable cause is subject to evolving case-law adjustments, but at its core it requires a factual demonstration or reason to believe that a crime has or will be committed. As the term implies, probable cause deals with probabilities. Brinegar v. United States, 338 U.S. 160, 175 (1949). It is not a "technical" standard, but rather is based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. Probable cause requires more than bare suspicion, but something less than a preponderance of the evidence. Thus, the evidence presented in support of a search need not be sufficient to support a conviction, nor even to demonstrate that an investigator's belief is more likely true than false, United States v. Burrell, 963 F.2d 976, 986 (7th Cir. 1992); there is no specific probability required, nor must the evidence lead one

10

to believe that it is more probable than not that contraband will be present. Bethea, 61 M.J. at 187. "The duty of the reviewing court is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit...there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238; see also Bethea, 61 M.J. at 187 (holding that the standard is a "flexible, common-sense" one) (citing Texas v. Brown, 460 U.S. 730, 742 (1983); Carroll v. United States, 267 U.S. 132, 162 (1925) (holding that probable cause to search exists when the facts and circumstances are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been committed).

With the Court's common sense standard of probable cause in mind, it follows that probable cause determinations are inherently contextual, dependent upon the specific circumstances presented as well as on the evidence itself. Indeed, probable cause is founded not on the determinative features of any particular piece of evidence provided an issuing magistrate -- nor even solely based upon the affidavit presented to a magistrate by an investigator wishing search authorization -- but rather upon the overall effect or weight of all factors presented to the magistrate.

United States v. Leedy, No. 06-0567/AF

Though there are no "specific 'tests' [that must] be satisfied" to find a substantial basis for probable cause, Gates, 462 U.S. at 231, our case law broadly bifurcates the review of a magistrate's determination into two "closely intertwined" analyses: first, we examine the facts known to the magistrate at the time of his decision, and second, we analyze the manner in which the facts became known to the magistrate. Thus, while the initial inquiry rightly centers on the evidence as set out in the four corners of the requesting affidavit, this evidence "may [then be] usefully illuminat[ed]" by factors such as the "veracity," "reliability" and "basis of knowledge" of the individual presenting the evidence. The magistrate then relies on these and other factors in determining the "commonsense, practical question whether there [was] 'probable cause' to believe that contraband...is located in a particular place." Id. at 230; United States v. Gallo, 55 M.J. 418, 421–22 (C.A.A.F. 2001).

Probable Cause

The question presented in this case is straightforward albeit compound: did A1C Winkler's description of the file titles on Appellant's computer as presented in SA Spring's affidavit, when assessed through the lens of the circumstances under which the magistrate came to know this information -- including SA Spring's experience investigating child pornography

12

and the magistrate's own, independent analysis of the facts --
provide a "substantial basis" for the magistrate to conclude
that there was a fair probability that child pornography would
be found on Appellant's computer?

SA Spring's affidavit consisted of two primary sections.
The first section provided SA Spring's background and expertise
in the area of child pornography.  The second section addressed
specific facts and circumstances supporting the request to
search Appellant's computer, providing background information
regarding Appellant's and A1C Winkler's room, their
relationship, computer arrangements, and Internet use.
Paragraph D contained the facts, or absence of facts, on which
the search authorization hinges.

> D.  Approximately one month ago (between the end of Jan
> 03 and the middle of Feb 03), Winkler was working at his
> computer when he inadvertently bumped [Appellant's]
> computer.  According to Winkler, [Appellant] routinely
> leaves his computer on, and when he bumped it,
> [Appellant's] screen saver turned off.  Winkler then
> observed what he believed to be the computer program
> "Windows Media Player" open on [Appellant's] computer.
> Winkler observed what he described as a "play list" for the
> program.  Based upon personal experience, I know that
> Windows Media Player is a computer program that can be used
> to play various computer files, including digital video
> files.  I also know, based upon my personal experience,
> that a "play list" is a list of recently "played" or
> accessed files.  Winkler stated that he observed several
> titles in the play list that he believed described
> pornographic files.  Winkler remembered seeing a file with
> the title "three black guys and one white girl" among
> others.  Winkler also saw a file titled "14 year old
> Filipino girl" in the same play list as the other file
> titles.

13

Appellant argues that based on the material provided in this affidavit probable cause is lacking. There is no evidence that the file names observed by A1C Winkler were titles of video, as opposed to audio files and no evidence in the record that A1C Winkler, or anyone else, had ever observed Appellant viewing pornography, to say nothing of child pornography, on his computer or anywhere else.[5]

Yet, as the Government notes, the title "14 year old Filipino girl" does not appear in isolation. SA Spring's affidavit states that

> Winkler stated that he observed several titles in the
> play list that he believed described pornographic
> files. A1C Winkler remembered seeing a file with the
> title "three black guys and one white girl," among
> others. A1C Winkler also saw a file titled "14 year
> old Filipino girl" in the same play list as the other
> file titles.

In his Essential Findings of Fact the military judge found that A1C Winkler noticed a list of files displayed on the Windows Media Player (on the computer desk top) that led him to

---

[5] A1C Winkler's statement to SA Spring suggests that the files were video in nature —- his statement speaks of "a list of movies" being displayed on the screen (rather than just "files"). However, this information is not contained in the affidavit presented to Magistrate Byers and the testimony presented to the military judge does not otherwise reflect that this information was provided to the magistrate orally. In addressing this issue, we rely alone on information that we know was presented to the magistrate at the time of his determination, as reflected in the affidavit, the military judge's findings and conclusions of law, and testimony in the record of trial addressed to the suppression motion that is consistent with the military judge's findings.

believe that A1C Leedy had child pornography on his computer. One file name that he remembered was '14 year old Filipino girl.' He did not clearly remember the name of any other files, but did recall that some mentioned ages and some mentioned acts."

Despite these findings, Appellant makes a colorable argument that this evidence when viewed in the abstract might be insufficient to establish a substantial basis to find probable cause to search for child pornography. Such a substantial basis would, after all, be based almost entirely on the existence of a single file. As interpreted by Appellant, such a conclusion is unwarranted as it derives from insufficient evidence which leaves too many gaps in SA Spring's knowledge to find probable cause. Such a gap could only be filled, according to Appellant, if there was a detailed description of the contents of the files in question.

Moreover, Appellant is correct in arguing that courts have generally relied on photographic descriptions of pornography before finding probable cause to search for pornography. See, e.g., United States v. Brunette, 256 F.3d 14 (1st Cir. 2001) (holding that appending a sample of the offending material to a warrant request was preferable). Indeed, the parties cite to

15

only one case in which an appellate court has upheld probable cause to search for child pornography based on titles alone.[6]

From a Constitutional perspective, the shortcoming in Appellant's argument is that he focuses almost exclusively on the title "14 year old Filipino girl" as the predicate for probable cause. It is evident that as is the case with many digital file titles found on the Internet or on one's personal computer, the title could be innocent. Consider the file name "Lolita," which on its own could as easily reference an English term paper, a discussion of teacher-student relations, or contain adult or child pornography. Likewise, in a vacuum, the title "Teen Angel" could as likely reference a popular 1960s song as it could be a video file containing child pornography. Similarly, a listing of any number of rap song titles might suggest images of violence and pornography, but not in fact visually convey those images when played. The point certainly is made.

However, in the current case, Appellant's file title "14 year old Filipino girl," does not appear in isolation.

---

[6] In United States v. Eichert, 168 Fed. App'x 151 (9th Cir. 2006), the court found probable cause where the magistrate was provided a list of about one-hundred newsgroup titles and file names with titles such as "teens, preteen, sex, children and young girls" and "sex words" but was not provided a description of the contents of the files or newsgroups themselves. Id. at 152. However, amicus curiae distinguishes Eichert on the ground that "the titles...were sufficiently detailed where one could assume the type of material the file contained."

Consequently, the title alone is not the sole predicate fact. As an initial factor, it is included on a sequential play list alongside titles that A1C Winkler understood to identify sex acts[7] and which the military judge concluded referenced sex acts.

Moreover, and critically, none of these facts are abstract pieces of evidence, but rather are properly viewed in context, through the professional lens in which they were presented to the magistrate. The magistrate had the benefit of the affiant's professional experience in investigating child pornography, a background which usefully "illuminated" the facts provided. Gates, 462 U.S. at 230.[8]

---

[7] The record includes a number of different statements regarding A1C Winkler's recollection of the file titles. The most descriptive is contained in his statement to AFOSI, which includes titles such as "White Slut banged by . . ." However, as noted earlier, in reviewing this case we have considered only that evidence the record indicates was provided to the magistrate as reflected in the affidavit, testimony, and the military judge's findings.

[8] In the affidavit, SA Spring provided his professional background:

> I have been a Special Agent with the Air Force Office of Special Investigations (AFOSI) since March 1994. I received training to be a Special Agent at the United States Air Force Special Investigations Academy . . . I have been assigned as the Detachment Commander of AFOSI Det 613, Kunsan AB (KAB), Korea since 28 Jun 2002. Prior to this assignment I was an instructor and course manager at the United States Air Force Special Investigations Academy for three years. In that capacity, I was responsible for development of course curriculum for both entry level and advanced training, including curriculum development for blocks of instruction dealing with the sexual abuse and

SA Spring's training and experience shed important light on the facts presented and addressed the magistrate's concerns on several measures.  First, in regard to the potentially benign nature of the file title in question, SA Spring indicated A1C Winkler believed that the sorts of titles surrounding the "14 year old Filipino girl" were indicative of titles associated with child pornography.

Second, SA Spring's experience addressed the magistrate's concerns that A1C Winkler's allegations might be stale, given the month (or more) that had elapsed between A1C Winkler's

exploitation of children . . . .  During my time as a Special Agent, I have participated in and supervised numerous criminal investigations involving the sexual abuse and exploitation of children.  I have the following education and training specific to investigations into the sexual abuse and exploitation and children:
- In 1994, I received basic instruction at the Special Investigations Academy that included analysis of persons involved in exploitation of children, their habits and common practices.
- In 1996, I received advanced instruction at the Special Investigations Academy that included analysis of persons involved in the exploitation of children, their habits and common practices.
- I hold a Masters of Forensic Science degree from the George Washington University.  Specifically, I received graduate level instruction on the investigation of crimes involving the exploitation of children, to include trafficking in child pornography and traits and characteristics of persons involved in such activities.
- As an instructor at the Special Investigations Academy from 1999-2002, I have attended numerous lectures and classes concerning the sexual abuse and exploitation of children.

discovering of the files and his reporting to AFOSI. In the first part of his affidavit, SA Spring stated that staleness concerns are usually misapplied in child pornography cases given that in his experience individuals who enjoy child pornography are invariably "collectors," almost always keeping their material permanently.[9] The one month lag alone was thus not likely to render A1C Winkler's statement inaccurate. Moreover, even if the offending file had been erased in the interim, from experience SA Spring was aware that trained computer forensic examiners can usually find digital files on hard drives even if users have deleted them.

We acknowledge that relying upon expertise too heavily, at the expense of hard facts, can be troubling and is open to abuse. However, such blind faith reliance is not present here, either by SA Spring or the magistrate. It is evident that SA

---

[9] SA Spring noted that "I have learned that the following characteristics are, generally, found to exist in varying combinations in cases involving people who view, collect, obtain, buy, trade or sell child pornography." The affidavit includes the following characteristics:

      D. These people rarely, if ever, dispose of their sexually explicit materials and often tend to maintain vast collections of such imagery . . .

      F. These people go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials...

      I. The Internet is frequently used to find, access, download, sell and/or trade sexually explicit images of children.

Spring did not simply rest on his training, passively filtering any evidence through his experience. SA Spring was actively skeptical about A1C Winkler's claims and did not immediately accept his concerns as legitimate. When A1C Winkler presented his information to the AFOSI, SA Spring performed an in-depth interview of the airman to assess his credibility. SA Spring questioned the airman about whether there was an ulterior motive behind his report and clearly established the limits of what was known and what was not. It was only once SA Spring had assessed the information and was confident that A1C Winkler's concerns were bona fide and that he had no "axe to grind" against Appellant that SA Spring presented the collected material to the base Chief of Military Justice for her assessment as to the existence of probable cause. After obtaining a judge advocate's assent, SA Spring wrote up a comprehensive affidavit to be presented to the magistrate requesting search authorization. The affidavit included both information about A1C Winkler's claims and SA Spring's professional judgment (based upon his education and experience) linking the claims to a likelihood that contraband would be present.

The constitutional propriety of SA Spring's behavior also comports with common sense. After all, if a sample of the child pornography or a detailed description of the contents of the pornographic image were required as predicate to search for

child pornography, law enforcement would be left in an untenable position: a substantial basis for finding probable cause to search for the contraband would only be available *after* the contraband had already been discovered.  Direct evidence of the very material sought would be needed and "[t]here is no requirement...that an affidavit present conclusive proof by direct evidence that the crime has been committed before a search warrant can issue."  Eichert, 168 Fed. App'x 152.

This is not to say that law enforcement officers should not include specific detail where such detail is available to substantiate search requests.  An affidavit that demonstrates that a subject has viewed child pornography and describes that pornography is more likely to substantiate probable cause than one that does not.  However, the Constitution does not, and common sense cannot, necessarily require such detail in order to properly find probable cause.

Case law is evolving as is our understanding of child pornography.  Child pornography is not new, but its proliferation on the Internet is a recent phenomenon raising new, and in some cases challenging, questions of law.  The Supreme Court has repeatedly directed reviewing courts to apply common sense and practical considerations in reviewing probable cause determinations.  In that context, a different legal picture emerges.  In an earlier era an investigator, magistrate,

or court might not have thought a file titled "14 year old Filipino girl" warranted investigation, even when surrounded by titles suggesting graphic pornography.  Today, applying our own common sense understanding, informed as it is by recent years which have seen many cases of child pornography, with the facts of such cases increasingly involving computers and digital files, we conclude that the gloss SA Spring applied to Appellant's file titles was well founded.  There is more than a fair probability that a list of files referencing sex acts that also includes a file referencing a fourteen-year-old child will result in the discovery of child pornography.[10]

Neutral and Detached Magistrate

We next address Appellant's argument that the military magistrate in this case failed in his duty to act in a neutral and detached manner.  Appellant does not challenge the independence and structure of military search approval generally, but rather asserts that in this case the magistrate was a "rubber stamp" for SA Spring's request.  However, the record suggests the contrary.

The base magistrate was Colonel (Col) Byers who was the Mission Support Group commander at Kunsan Air Base and had more

_____

[10] As we find that the authorization was proper, we need not address the availability of any good faith exception to the authorization requirement that may have been present in this case.  See United States v. Leon, 468 U.S. 897 (1984); Gallo, 55 M.J. at 422.

than two decades of experience in the Air Force.  There is no evidence that the magistrate had any generalized proclivity towards simply conceding search requests to investigators.  In fact, shortly before he reviewed the search request at issue here, Col Byers had been involved in "a number of probable cause determinations" including at least one case where he declined authorization until the government provided additional predicate information.

Moreover, in the current case, the magistrate evidently closely read the affidavit, and questioned SA Spring about the matter for more than twenty minutes, raising many of the concerns that Appellant now echoes.  Col Byers voiced his trepidations about whether A1C Winkler could be trusted, the length of time between A1C Winkler's finding of the files and his report to AFOSI, that no one had actually seen any pornography played on Appellant's computer, and about whether the file names provided were actually pornographic. [11]  The magistrate explicitly, and properly, relied on SA Spring's experience -- stating, for instance, that he concurred with SA

---

[11] In his testimony, Col Byers recalled his discussions with SA Spring:

> My concern was how do you know that [the file] would be pornographic...in nature and [SA Spring] said because of other titles that [A1C] Winkler recollected seeing....And based on the discussions with [A1C] Winkler that [SA Spring] felt that those titles would indeed lead to some type of picture or video...of a pornographic nature.

23

Spring's assessment that there was a substantial basis to believe that the file names were pornographic based upon "[SA Spring's] experience and some cases that he's had and the evidence that those type [sic] of titles taken in context...was that [those files] could be pornographic in nature" -- but Col Byers did not simply defer to SA Spring's expertise.[12] The magistrate did not immediately accept SA Spring's answers; he proceeded to speak with others including A1C Winkler's and Appellant's commanding officer to gain further insight about whether there was any motive for A1C Winkler to fabricate charges against Appellant. It was only after this investigation and further consultation with the legal office that the magistrate issued the authorization.

Mirroring the analysis required from Gates and our own cases, the magistrate acted in light of his own investigation of the facts, and paid heed to the circumstances in which he learned of the facts (including the substantial professional history of the affiant). It was only then that the magistrate expressed confidence in SA Spring's affidavit and was convinced that the requirements for probable cause had been met.[13] On

---

[12] The military judge found that though when "Col Byers reviewed the affidavit, he did review SA Spring's training and experience, [he] generally was focused on [SA Spring's] knowledge of the facts as they pertained to this case."

United States v. Leedy, No. 06-0567/AF

these facts, we conclude that the magistrate was neither unmindful of his duties nor was he insufficiently detached from the requesting investigator.  See, e.g., United States v. Cravens, 56 M.J. 370, 373, 376 (C.A.A.F. 2002) (in which this Court adopted the military judge's finding that a magistrate appropriately fulfilled his role as a neutral and detached magistrate, and that his decision was clearly his own after he asked responsible questions, considered the views of the investigators and judge advocate advisor and only then made his decision).

## DECISION

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

---

[13] While SA Spring followed good practice and precedent in including in the affidavit material from A1C Winkler, buttressed by his own expertise, we note with approval that SA Spring clearly delineated in the affidavit what claims were made by the informant and what conclusions were reached as a result of SA Spring's experience in the matter.  The magistrate was thus fully informed as to what was solid fact and what was presented as inference.

<u>United States v. Leedy</u>, No. 06-0567/AF

ERDMANN, Judge (concurring in the result):

I respectfully disagree with the majority's conclusion that the magistrate had a substantial basis for determining that probable cause existed. Because I believe that the good faith exception applies to this case, however, I concur in the result.

I agree with the majority that we review the magistrate's determination that probable cause existed by examining the facts known to the magistrate at the time of his decision and by analyzing the manner in which the facts became known to the magistrate. The magistrate must be provided sufficient information to make an independent determination about the existence of probable cause under the totality of the circumstances. <u>United States v. Monroe</u>, 52 M.J. 326, 331 (C.A.A.F. 2000)(citing <u>Illinois v. Gates</u>, 462 U.S. 213, 239 (1983)).

Here, the facts known to the magistrate were presented through the affidavit of SA Spring and indicated the following: Leedy's roommate, Winkler, informed SA Spring that Leedy's computer was positioned in such a way as to preclude others from directly observing his monitor; Leedy told Winkler that he downloads files from the internet; and Winkler observed the play list on Leedy's Windows' Media Player and believed several titles described pornographic files. Two file titles were named

in the affidavit, "three black guys and one white girl" and "14 year old Philipino girl."

Even considering that these facts were filtered through the expertise of SA Spring when presented to the magistrate, I believe they fall short of demonstrating a fair probability that child pornography would be found on Leedy's computer. Two of the facts -- that Leedy's computer monitor was positioned for privacy and that Leedy downloads internet files -- are such common occurrences of innocent daily activity that they add very little, if anything, to a common-sense analysis of probable cause. I do not believe that what remains -- the two file titles and the unexplained belief of Leedy's roommate that other file titles were pornographic -- is enough to justify the search of an individual's personal computer for child pornography. Although the standard for probable cause does not necessarily require that the illegal images be attached or described, a common-sense approach demands more concrete information than what was provided here to establish a fair probability that evidence of a crime will be found. See Monroe, 52 M.J. at 331-32. An investigator's expertise may add value in certain instances, but the scarce facts of this case establish an underlying deficiency that reliance on an investigator's experience and training cannot overcome.

2

In this regard, the majority relies on a finding by the military judge that Winkler "did not clearly remember the name of any other files, but did recall that some mentioned ages and some mentioned acts." If the magistrate did in fact have this information before him, the case for probable cause is stronger. However, this information was not included in SA Spring's affidavit and there is no evidence that these specific details were presented to the magistrate. Rather, this fact was part of Winkler's statement to AFOSI, which the majority correctly excluded from consideration because the magistrate did not review that statement. The AFOSI statement, nevertheless, was presented to the military judge for his consideration on the motion to suppress the results of the search. To the extent that the military judge relied on that statement, he erred. For this reason, the fact that Winkler recalled seeing unnamed titles that mentioned ages and acts is not part of this court's consideration.

Although I do not believe probable cause existed, I nevertheless concur in the result because I would find that the good faith exception applies in this case. The good faith exception, which is contained in Military Rule of Evidence 311(b)(3), provides as follows:

> Evidence that was obtained as a result of an unlawful search or seizure may be used if:

3

United States v. Leedy, No. 06-0567/AF

> (A) The search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under Mil.R.Evid. 315(d) or from a search warrant or arrest warrant issued by competent civilian authority;

> (B) The individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and

> (C) The officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith shall be determined on an objective standard.

See also United States v. Leon, 468 U.S. 897 (1984).

In its application, the good faith exception is notably broad where, as here, there is no evidence of law enforcement misconduct. In United States v. Leon, the Supreme Court explained that the Fourth Amendment itself does not expressly require excluding evidence that was obtained in violation of its command. Rather, the exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." 468 U.S. at 906 (citation and quotation omitted). Use of the exclusionary rule is to prevent further police misconduct in other cases, not to compensate the individual whose Fourth Amendment rights were violated or to punish the errors of judges and magistrates. 468 U.S. at 906, 916. The Supreme Court concluded that:

4

> In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.  Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. . . . Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

468 U.S. at 921 (citation and quotation omitted).

Consistent with this precedent, this court has previously determined that:

> "Substantial basis" as an element of good faith examines the affidavit and search authorization through the eyes of a reasonable law enforcement official executing the search authorization.  In this context, the second prong of Mil.R.Evid. 311(b)(3) is satisfied if the law enforcement official had an objectively reasonable belief that the magistrate had a "substantial basis" for determining the existence of probable cause.

United States v. Carter, 54 M.J. 414, 422 (C.A.A.F. 2001).

With this backdrop, I conclude that the good faith exception applies in this case.  The facts here raise no issue under M.R.E. 311(b)(3)(A).  As to M.R.E. 311(b)(3)(B) and 311(b)(3)(C), even though I find SA Spring's affidavit is insufficient to support the magistrate's determination that probable cause existed, the deficiencies are not so egregious that the law officer executing the warrant should be faulted for relying on the magistrate's probable cause determination. Because the good faith exception would allow the prosecution to use the evidence obtained from the search of Leedy's computer, I

5

would affirm the decision of the United States Air Force Court of Criminal Appeals on this alternative ground.