# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**Misc. Dkt. No. 2019-07**

_____

**UNITED STATES**
*Appellant*

**v.**

**Kaleb S. GARCIA**
Senior Airman (E-4), U.S. Air Force, *Appellee*

_____

Appeal by the United States Pursuant to Article 62, UCMJ

Decided 10 April 2020[1]

_____

*Military Judge:* Bradley A. Morris (arraignment); Elizabeth M. Hernandez (motions).

*GCM convened at:* Minot Air Force Base, North Dakota.

*For Appellant:* Captain Kelsey B. Shust, USAF (argued); Colonel Shaun S. Speranza, USAF; Mary Ellen Payne, Esquire.

*For Appellee:* Captain M. Dedra Campbell, USAF (argued); Mark C. Bruegger, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge KEY joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

---

[1] We heard oral argument in this case on 26 February 2020.

POSCH, Judge:

The Government brings this interlocutory appeal under Article 62, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862,[2] challenging the military judge's ruling to suppress evidence obtained as a result of a search and seizure of Appellee's DNA from buccal cells on the inside of Appellee's cheeks. The Government maintains that Appellee's DNA was taken pursuant to a search authorization supported by probable cause that was untainted by either the conduct of military personnel or a prior suppression of Appellee's DNA that was obtained by those personnel. We agree and find the military judge abused her discretion in suppressing the evidence.

## I. PROCEDURAL HISTORY

Appellee is charged with sexual assault of Airman First Class (A1C) JL by penetrating her vulva with his penis without her consent in violation of Article 120(b)(2)(A), UCMJ, 10 U.S.C. § 920(b)(2)(A).[3] Appellee was arraigned on 14 June 2019, at which time the military judge granted Appellee's request to defer motions and pleas. Hearings in the case were held at Minot Air Force Base (AFB), North Dakota (ND), on 19–20 August 2019, and 1–7 November 2019 in which the parties presented evidence and argument related to several motions.

On 26 August 2019, following the first motions hearing, the military judge suppressed buccal and penile swabs obtained from Appellee pursuant to a February 2019 search authorization. The military judge determined the Air Force Office of Special Investigations (AFOSI) agent, Special Agent (SA) B, who sought the search authorization made materially false statements that Appellee's commander relied on to find probable cause. The military judge concluded SA B "acted knowingly and intentionally and with reckless disregard for the truth," and absent SA B's falsehoods, probable cause would not have supported the search. On 3 November 2019, the military judge denied the Government's motion to reconsider her ruling. The Government did not appeal the suppression of the February 2019 search and seizure.

Meanwhile, on 4 October 2019, the Government sought a second search authorization for Appellee's DNA, which is the subject of this appeal. This time the Government requested a military judge, separate from the presiding judge

---

[2] All references in this decision to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] This is an additional charge. Appellee also stands charged with two specifications of sexual assault of another female Airman alleged to have occurred before the incident in question involving A1C JL.

at Appellee's trial, to act as the authorizing official for the search. The Government provided two affidavits in support of its request: an affidavit from SA RD (an experienced agent who worked the case with SA B), and an affidavit from Mr. MT, a forensic biologist at the United States Army Criminal Investigation Laboratory (USACIL) who tested vaginal swabs collected from A1C JL's sexual assault forensic examination (SAFE) and previously conducted DNA analysis of Appellee's February 2019 buccal and penile swabs that the trial judge had suppressed.

On 8 October 2019, a different authorizing official found probable cause and allowed the search and seizure of a second set of buccal swabs from Appellee's person, which SA RD obtained the next day. Forensic analysis of the swabs by Mr. MT revealed Appellee's DNA was one of two contributing male DNA profiles represented on A1C JL's vaginal swabs.

On 28 October 2019, Appellee moved to suppress evidence obtained as a result of the October 2019 search and seizure. On 5 November 2019, a suppression hearing was held during an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, and the parties presented evidence and argument on the legality of the October 2019 search and seizure. On 6 November 2019, the military judge issued her written ruling and again suppressed Appellee's DNA. The trial counsel notified the military judge of its appeal within 72 hours of her ruling. Article 62(a)(2), UCMJ, 10 U.S.C. § 862(a)(2).

Appellee's court-martial has been stayed, *see* Rule for Courts-Martial 908(b)(4), pending the Government's appeal of the military judge's 6 November 2019 ruling granting Appellee's motion to suppress.

## II. BACKGROUND

### A. Investigation of Appellee

The relevant charge in this appeal stems from an incident involving Appellee and A1C JL that occurred at Appellee's off-base apartment in Minot, ND, in the early morning hours of Saturday, 2 February 2019. On Sunday, 3 February 2019, A1C JL called her first sergeant to report that she was possibly sexually assaulted by Appellee at his off-base residence over the weekend. The first sergeant relayed this information to special agents of the AFOSI who initiated an investigation.

### 1. Initial Interview of A1C JL

The same day AFOSI received the first sergeant's report, SA B and SA RD conducted a video-recorded initial interview with A1C JL, which lasted about 20 minutes. SA B testified that the interview was short because its purpose was to determine if there was credible information "to go forward and get [A1C

JL] a sexual assault kit . . . because that evidence is fleeting." SA B also explained the purpose of the initial interview was to determine if there was "probable cause to get search warrants for other things like the residence where [a sexual assault] might have occurred or sexual assault kits on the alleged offenders."

A1C JL told the AFOSI agents that after a night of heavy drinking with Appellee and other friends, she and a male Airman, Senior Airman (SrA) CG, returned with Appellee to Appellee's apartment. The three continued drinking and were talking in Appellee's spare bedroom until she "blacked out completely." A1C JL then described waking up twice during the night under circumstances that involved altercations with Appellee, and him alone.

In the first incident, A1C JL described waking up to Appellee "trying to have sex with [her]." She told the agents he was "pretty much on top of [her]" and she "*didn't even know if [she] had clothes on* or anything[.]" (Emphasis added). She said she "ha[d] no idea because [she] was so drunk at the time, like [she] was unconscious." A1C JL told the agents she was certain it was Appellee because when she asked, "What the f[**]k's going on?" a male voice she recognized responded, "It's Garcia." She also recognized Appellee's face. A1C JL told the agents she was "pretty sure [she] fell back asleep."

A1C JL described a second incident in which she woke up at 0300 or 0400 hours, Appellee was trying to get her to take a shower, and "[he] got really mad" when she refused. She told the agents she was "pretty sure he had sex with [her]," and explained she left the bedroom after the shower incident and fell asleep on the couch in the living room. One of the agents asked her, "Do you think there was any way [SrA CG] could have touched you or was it just [Appellee]?" She replied, "I want to say no, but I don't know because . . . I was asleep."

She told the AFOSI agents she wanted a "rape kit" but did not know how to get one and was concerned any evidence was lost because she had taken a shower when she returned home from Appellee's residence. A1C JL agreed to participate in a SAFE by a sexual assault nurse examiner (SANE). Before leaving for the examination she asked the agents, "What happens if I get pregnant with him?" and volunteered she "bought Plan B at the store earlier today" but had not taken it yet.

As the interview was ending, A1C JL told the agents that she did not know if Appellee ejaculated. She then stated she was not wearing clothes when she awoke to Appellee trying to have sex with her, which was at odds with her earlier statement that she could not recall if she was clothed at the time: an agent asked, "Do you remember him being inside of you?" She answered, "just that he was on top of me . . . *like I didn't have any clothes on*, like from, I can't

remember, really, anything, I just remember waking up to him . . . ." (Emphasis added).

### 2. A1C JL's SAFE at Trinity Hospital

After the interview, A1C JL went to Trinity Hospital in Minot, ND, and a SAFE was accomplished. While waiting at the hospital, A1C JL exchanged text messages with Appellee about the night in question in a pretext conversation that SA RD helped facilitate. Appellee told her it was SrA CG who had sex with her that night and not him. Appellee explained that he was in the spare bedroom looking for shorts, and the reason he wanted her to take a shower was because she spilled beer all over herself.

As part of the forensic examination, the SANE collected several biological samples, including vaginal swabs. The SANE included a typed narrative in her report of A1C JL's first-person account of the incident in question. The narrative in the SANE report—captured in the nurse's words—is more disjointed and non-linear compared to A1C JL's initial interview with the AFOSI agents that the agents video-recorded:

> Patient states, "'. . . [W]e stopped at [t]he . . . liquor store and then we went to [Appellee]'s house. I had about [two] more drinks there and then I don't remember much of anything. We talked on the couch about [Appellee's] current sexual assault situation[4] and we played some beer pong and that's really all I remember. Then *he woke me up at 3 in the morning and he was trying to get me to take a shower*. I kept saying 'Why?' but he wouldn't say anything. He was on top of me and I said 'Who is this?' He said 'Garcia' and that's how I knew it was him. I didn't take a shower at that time then I went out to the couch and passed back out.'" Patient states that *her clothing was on when she woke up at 0300*. At this time, the patient does not recall any details of the events that occurred. Patient states that "it felt like I had sex."

(Emphasis added) (footnote added).

The military judge and Appellee rely on the narrative for the proposition that A1C JL was clothed when she felt like she had sex. For reasons not apparent from the record, the SANE was not called to testify at either suppression hearing.

### 3. First Authorization to Search and Seize Appellee's DNA

---

[4] A1C JL knew a female Airman had accused Appellee of sexual assault. She and SrA CG were discussing the case with Appellee before she fell asleep in the spare bedroom.

While SA RD was with A1C JL at Trinity Hospital and before AFOSI received the SAFE report including the SANE's typed narrative, SA B contacted the chief of military justice (CMJ) at the base legal office for advice on seeking search authorization for Appellee's DNA. SA B relayed the facts garnered from the AFOSI interview with A1C JL, and was advised to seek verbal authorization from Appellee's commander to search and seize Appellee's DNA.

Also on 3 February 2019, at 1909 hours, SA B provided the following information to the commander in a recorded three-party phone call that included the CMJ:

> [A1C JL] believes she passed out with her clothes on in [Appellee]'s spare bedroom and her next memory is she woke up to [Appellee] on top of her *and she wasn't wearing any clothes and neither was he* and she knows it was [Appellee] because she said "who is this" and he said "it's Kaleb Garcia" and she looked at his face and knows what his face looks like and *he was vaginally penetrating her* and she passed back out and then she woke up around three or four in the morning and [Appellee] instructed her, he said, "hey you need to go take a shower" and she refused and then moved from the spare bedroom to the couch.

(Emphasis added).

Based on the information provided by SA B, Appellee's commander gave verbal authorization to conduct "[a] complete [SAFE] of [Appellee] to include penile swabbings, pubic combings, buccal swabs, and fingernail clippings." Half an hour later SA B drove to the commander's residence where he memorialized his earlier verbal authorization by signing an Air Force (AF) Form 1176, *Authority to Search and Seize.*

At some point after executing the verbal search authorization on 4 February 2019, but before presenting a written affidavit to the commander on 5 February 2019, SA B testified she realized the information she verbally relayed to Appellee's commander was incorrect. A1C JL's memory whether she was clothed was more uncertain than SA B had relayed when she sought verbal authorization, and A1C JL had not described whether Appellee was clothed. Additionally, SA B relayed to Appellee's commander during the phone call her assurance that Appellee penetrated A1C JL vaginally, which was unwarranted based on the information A1C JL gave in her initial interview with the AFOSI agents.

SA B brought the erroneous information to the attention of the CMJ. The CMJ testified she advised SA B to keep the information in her affidavit the same as she had briefed to the commander, without any changes. The CMJ's

rationale for doing so was because she believed the affidavit should mirror the facts that the AFOSI agent previously provided.[5]

In accordance with the CMJ's advice, even after learning her affidavit contained incorrect information before she signed it, SA B failed to correct it or attempt to re-accomplish the authorization with information that accurately relayed what A1C JL told the AFOSI agents. On 5 February 2019, Appellee's commander administered an oath to SA B who signed the affidavit attesting to the veracity of the incorrect information.

### 4. Appellee's Interview and Execution of the Search Authorization

The AFOSI agents interviewed Appellee on 4 February 2019. He denied having any sexual contact with A1C JL, but relayed that SrA CG and A1C JL had sexual contact with each other throughout the evening. Appellee assumed A1C JL and SrA CG had sexual intercourse in his spare bedroom. Appellee asserted he was never alone with A1C JL other than three minutes in the spare bedroom when he went looking for SrA CG's shorts because SrA CG was wearing Appellee's pants. Also on 4 February 2019, the AFOSI agents took Appellee to the hospital to undergo the SAFE authorized by his commander.

### 5. Interviews with SrA CG

That same day, the AFOSI agents interviewed SrA CG, who admitted to engaging in sexual intercourse with A1C JL during the evening in question. He described A1C JL as an active participant and told the AFOSI agents he could not remember if he ejaculated inside of her because he was intoxicated. SrA CG consented to a seizure of his DNA, and SA RD obtained two buccal swabs and sent them to the USACIL for forensic analysis.

On 7 February 2019, the AFOSI agents interviewed SrA CG a second time. He told the agents that after returning to Appellee's apartment the three played a few games and watched a movie. When A1C JL went to use the restroom, Appellee indicated to SrA CG that he wanted to have a threesome and SrA CG declined, giving the reason that Appellee was married. Later in the evening, SrA CG had sexual intercourse with A1C JL in Appellee's spare bedroom. Afterwards, he fell asleep in the bed with A1C JL and believed A1C JL fell asleep as well.

SrA CG told the AFOSI agents he heard Appellee cleaning the living room and went to help him, leaving A1C JL in the spare bedroom. After the cleaning was finished, SrA CG looked for a movie to watch while Appellee went to tell A1C JL what they were doing. He told the AFOSI agents Appellee was gone

---

[5] The CMJ participated as trial counsel at the arraignment on 14 June 2019, but not during subsequent Article 39(a), UCMJ, sessions of court.

approximately 10 to 20 minutes and then returned, with A1C JL, to the living room from the spare bedroom. They both returned from the bedroom clothed.

### 6. Second Interview with A1C JL

On 5 February 2019, SA B and SA RD conducted a second interview of A1C JL. She described she was home on Friday night drinking alcohol and making plans for the evening. She told the AFOSI agents at the time she was living again with her ex-boyfriend because her new apartment flooded and had bed bugs.

A1C JL described going out drinking with friends and returning with Appellee and SrA CG to Appellee's apartment. The three played beer pong and then talked with Appellee about his pending sexual assault case in the spare bedroom. She fell asleep and later awoke to Appellee trying to have sex with her. Appellee's face was in her neck, he was touching her stomach, and his body was slightly to her side, but she was unsure if he was vaginally penetrating her or not. She was wearing her shirt, but was unsure if she had on underwear or pants.

A1C JL told the AFOSI agents her next memory was standing in the bathroom naked with Appellee who turned on the shower and told her to get in. She told the AFOSI agents she refused because she believed Appellee was trying to wash away evidence that he had sexual contact with her. After she refused, she put her clothes back on and slept near SrA CG on a couch in the living room.

### 7. DNA Analysis

The evidence obtained by AFOSI was sent to the USACIL for forensic analysis. On 15 March 2019, Mr. MT, a forensic biologist at the USACIL, completed a DNA analysis on A1C JL's and Appellee's SAFE kits and SrA CG's buccal swabs. Appellee's DNA profile was matched to one of two male DNA profiles obtained from semen residue found on A1C JL's vaginal swabs. Mr. MT identified the second DNA profile as belonging to SrA CG.

## B. First Suppression Ruling

In a written ruling on 26 August 2019, the military judge granted the Defense's motion to suppress evidence obtained from the 4 February 2019 search and seizure of Appellee's DNA. The military judge determined that SA B gave false information to Appellee's commander on 3 February 2019 when she sought verbal authorization. The military judge found SA B told the commander that "[A1C JL] woke up to [Appellee] on top of her and she wasn't wearing any clothes and neither was [Appellee]," and that Appellee "was vaginally penetrating her." The agent's statements are recorded and not in dispute.

The military judge found SA B knew her statements were "intentionally false" because "A1C JL told SA [B] earlier that day she could not remember if either of them were wearing clothes and she did not know if vaginal penetration occurred." The military judge found that during A1C JL's initial 20 minute interview she "consistently maintained that she was unsure whether penetration occurred" and yet "believes the [Appellee] had sex with her." In fact, A1C JL told both AFOSI agents she was "pretty sure [Appellee] had sex with [her]." A1C JL's statement to the agents is recorded and also not in dispute. However, this fact was omitted in the military judge's written rulings granting the Defense motion and denying the Government's motion for reconsideration.

The military judge ruled the Defense met its burden to show that SA B "acted knowingly and intentionally and with reckless disregard for the truth." Further, the military judge found the Government failed to meet its burden of proving by a preponderance of the evidence, with the false information set aside, that the remaining information presented to the authorizing officer was sufficient to establish probable cause.

**C. Second Authorization to Search and Seize Appellee's DNA**

After the first hearing that resulted in the suppression of Appellee's DNA, in October 2019, Captain (Capt) JS[6] of the Minot AFB legal office advised SA RD to accomplish an affidavit to support a second search authorization. Capt JS did so after the base legal office sought guidance on what to do next from higher headquarters following the suppression ruling. At the second suppression hearing, SA RD testified that it was not his independent decision to seek a second authorization because the AFOSI investigation was closed. He prepared his affidavit after examining the report of investigation along with recorded witness interviews and notes he took during interviews. Capt JS reviewed and edited SA RD's draft, added a summarized transcript of the agents' initial recorded interview with A1C JL, and then on 4 October 2019 notarized SA RD's signature. Before doing so, SA RD reviewed and considered each revision made by the legal office before adopting it as his own.

SA RD then sought authorization to collect buccal swabs from Appellee to compare his DNA against DNA from two contributing males that had been

---

[6] Capt JS participated as assistant trial counsel at arraignment, and as trial counsel under the supervision of a circuit trial counsel during all subsequent Article 39(a), UCMJ, sessions of the court-martial.

determined by forensic analysis of A1C JL's vaginal swabs. This time, the Government requested a military judge with no involvement in the matter to authorize a search and seizure of Appellee's DNA.

The Government provided the authorizing official with two affidavits in support of its request:[7] the affidavit SA RD accomplished on 4 October 2019 with the assistance of Capt JS, and a 30 September 2019 affidavit from Mr. MT, the forensic biologist from the USACIL who had tested vaginal swabs collected from A1C JL's SAFE kit, the buccal swabs obtained from SrA CG, and Appellee's DNA that had been suppressed.

**1. SA RD's 4 October 2019 Affidavit**

In his affidavit in support of the second search authorization, SA RD summarized the information obtained in the AFOSI investigation and arranged it mainly in chronological order. SA RD included a summarized transcript of portions of A1C JL's recorded interview on 3 February 2019:[8]

> . . . [A1C] JL: That's where everything kinda gets blur[r]y, and I blacked out completely, like unconscious pretty much. And I ended up waking up half way through the night and Garcia was trying to have sex with me. And kinda fell—I'm pretty sure I fell back asleep, and he woke me up at 0300 or 0400 am telling me to go take a shower. **And I'm pretty sure he had sex with me**. Um and I refused to take a shower and he got really mad. Then I went and slept on the couch and I woke up in the morning and they were kinda just acting fine and everything like that so. And then **I was gonna go get a rape kit** but then I didn't know if I had to go through like TRICARE or anything like that so I didn't do it [inaudible] because I didn't know how that all worked.
>
> . . . SA [B]: Well so that's actually the next step that we'll do after this is that we'll take care of it, we'll go down to Trinity and get a kit done.

---

[7] The CMJ emailed the Government's request to the authorizing official. As evident from an attachment to Appellee's 28 October 2019 motion to suppress, both affidavits were included in the email. However, the AF Form 1176, *Authority to Search and Seize*, signed by the authorizing official, states "This authorization incorporates the attached affidavit of [SA RD], dated 4 October 2019," and does not reference any other document. The military judge concluded the authorizing official reviewed both affidavits as part of his probable cause determination.

[8] This conversation is from SA RD's affidavit. The bold and underlined portions of the following quote appear in the original text, along with [inaudible] and [JL responds no]. All other alterations were made by this court.

. . . SA [B]: So just give me a little more detail on when you blacked out to when you woke up to Garcia trying to have sex with you. Can you just give me a little more detail?

. . . [A1C] JL: Um well I like, I guess I, because we were all like talking in the spare bedroom after we got done playing pong. And I guess I just fell asleep because I was so drunk. And then I woke up with him pretty much on top of me. I didn't even know if I had clothes on or anything like I have no idea because I was so drunk at the time, like I was unconscious so.

. . . SA [RD]: How did ya—I mean when you said you woke up you knew it was him, how did you know it was him? I mean what stood out to you to say you know it's Garcia? Anything in particular? His face—I mean I'm sure you recognize—

. . . [A1C] JL: His face, [inaudible] ya it was definitely him. And he said . . . I was like "who is that" and he was like "it's Garcia." So I knew it was him.

. . . SA [B]: Do you think—um do you have any other injuries or anything like that? [JL responds no]. **Okay um was it just vaginal intercourse**, was there any like anal intercourse or anything like that?

. . . [A1C] JL: Not that I—I don't think so.

. . . SA [B]: Ya do you have any other questions for us . . .

. . . [A1C] JL: Um the last thing is, is like **what happens if I get pregnant with him?**

. . . SA [RD]: Do you remember him, I'm sorry just one—being inside of you? I mean did you remember that at all? Or just that he was on top of you?

. . . [A1C] JL: Just that he was on top of me and like I didn't have any clothes on. Like from, like I can't remember really anything. I just remember waking up to him.

The affidavit then relayed that a SANE at Trinity Hospital conducted a SAFE. As part of the medical exam, the SANE collected, among other things, four vaginal swabs from A1C JL. The affidavit informed that the SAFE kit was sent to the USACIL for DNA analysis so that "[a]ny DNA found on [A1C JL's] vaginal swabs can be compared to DNA collected from [Appellee's] buccal swabs" that were the subject of the Government's request for authorization. Although SA RD had reviewed the SANE's report, he did not include any information from the report, such as that A1C JL told the nurse "her clothing

was on when she woke up at 0300" when Appellee tried to make her take a shower. He likewise omitted that A1C JL told the nurse she "does not recall any details of the events that occurred."

SA RD averred that also on 3 February 2019, while waiting for the SAFE, A1C JL texted Appellee and asked him if they had sex on Friday night, 1–2 February 2019. Appellee replied that they did not have sex, but that she had sex with SrA CG. A1C JL then asked Appellee why he was in the room on top of her if they did not have sex. Appellee replied that he was in the room looking for "Soffe" brand shorts. She then asked him why he told her she needed to take a shower. He replied that she had spilled beer all over herself, so he wanted her to clean up. SA RD averred that Appellee continued to deny any sexual contact with A1C JL and restated that SrA CG was the only person who had sex with her on Friday night. SA RD further averred that he and SA B conducted an interview with Appellee who told the agents he "never touched [A1C JL] sexually between 1–2 Feb 19 and that he has never had sex" with her. Appellee "stated that he was never alone with [A1C JL] aside from three minutes in the spare bedroom. When asked if there was any reason forensic examiners would find [Appellee]'s DNA inside of [A1C JL], [Appellee] responded, 'Shouldn't, no.'"

SA RD averred that on 5 February 2019, he and SA B conducted a second interview of A1C JL. A1C JL told the AFOSI agents that she was "pretty drunk" at Appellee's apartment and "lost memory" after "shot gunning" a beer. The affidavit further relayed that

> [A1C JL] remembered having a conversation with [Appellee] and [SrA CG] in the spare bedroom about [Appellee]'s pending court case.[9] [She] could not remember how she got into the spare bedroom. [She] remembered falling asleep and then woke up to [Appellee] "trying to have sex with her[.]" [She] stated her memory was waking up to [his] face in her neck and touching her stomach. [She] stated [his] body was slightly to the side of her. [She] was wearing her shirt, but was unsure if she had on any underwear or pants. [She] was unsure if [he] was vaginally penetrating her or not. When [she] woke up to [Appellee], [she] asked, "Who is this?" and [Appellee] responded, "It's Garcia. Don't you remember?" [She] responded, "What the f**k," and passed out

---

[9] Near the end of his affidavit, SA RD explained the Minot AFB AFOSI detachment "previously ran an investigation on [Appellee] for allegedly sexually assaulting another victim in his home, which was initiated on 27 Aug 18," and that "[o]n 7 Jan 19, [Appellee] was formally charged with violating [UCMJ] Article 120, Sexual Assault related to the previous allegation."

again. [She] was certain it was [Appellee], not [SrA CG], because [Appellee]'s voice was much deeper than [SrA CG]'s voice. [Her] next memory was standing in the bathroom naked with [Appellee]. [Appellee] turned the shower on and told her to get in. [She] refused because she was scared [he] was trying to get rid of evidence that he had any sexual contact with [her]. After [she] refused, [she] put her clothes back on, which she believed were all in the bathroom, and slept on the couch next to [SrA CG].

(Footnoted added).

SA RD averred that on 7 February 2019, he and SA B interviewed SrA CG who relayed the following information: While playing pool at a bar on Friday night, A1C JL "missed hitting the scratch ball with the pool stick multiple times because she was so intoxicated." After going to Appellee's apartment, the three sat on the couch talking. A1C JL continued to drink alcohol at the apartment, and they all played a few games of beer pong before they watched a movie. SA RD relayed in his affidavit that SrA CG "ha[d] sex with [A1C JL] in the spare bedroom," after which "[SrA CG] recalled hearing [Appellee] cleaning the living room and went to help him. [Appellee] told [SrA CG] to put a movie on while he went to get [A1C JL]." The affidavit stated SrA CG told the AFOSI agents that

> [Appellee] and [A1C JL] were in the spare bedroom alone for approximately 10–20 minutes, then they both came out to the living room clothed. Eventually, [A1C JL] walked into the living room first. [SrA CG] did not recall any discussion or sounds coming from the room or any sounds coming from the shower or bathroom. He did not recall which room they came from. [SrA CG] did not remember [Appellee] asking [A1C JL] to take a shower.

SA RD further averred that after additional questioning, SrA CG disclosed to the AFOSI agents that "[Appellee] was talking about 'something could happen' that night, or words to that effect, meaning he wanted to have sex with [A1C JL]." As described in SA RD's affidavit, SrA CG explained to the agents that

> [a]t some point while in the living room after playing beer pong, [Appellee] asked [SrA CG] to have a threesome (having sex with three people) with [A1C JL]. [SrA CG] said no because [Appellee] was married. Even though [SrA CG] said no, [Appellee] kept nodding his head towards him and [A1C JL], and then nodding his head towards the spare bedroom. [SrA CG] opined that [Appellee]'s gestures meant he wanted them all to go to the spare

bedroom to have sex, so [SrA CG] shook his head no in response. This exchange occurred earlier in the night before [SrA CG] and [A1C JL] had sex, and before [Appellee] went into the spare bedroom alone with [A1C JL] for approximately 10–20 minutes.

SA RD concluded his affidavit stating "[b]ased on the information provided by [A1C JL] and the interview of [SrA CG] on 7 Feb 19, and my training and experience, I believe there is probable cause to obtain buccal swabs from [Appellee] for DNA analysis and comparison with the SAFE kit obtained from [A1C JL] during the course of this investigation." Finally, SA RD stated that on 2 October 2019, he had "briefed the above facts and circumstances to Capt [JS], 5th Bomb Wing, Staff Judge Advocate (SJA) office . . . who agreed there was sufficient probable cause to collect DNA from [Appellee]."

### 2. Mr. MT's 30 September 2019 Affidavit

Mr. MT's 30 September 2019 affidavit, which the Government also provided to the authorizing official, stated he identified the presence of DNA "originating from three individuals" on the vaginal swabs he analyzed from A1C JL's SAFE kit. Among the three DNA profiles, Mr. MT identified two as male contributors. Mr. MT reported one profile belonged to SrA CG, and the other as an "unknown male." However, at the time Mr. MT conducted the second analysis he knew that the second profile matched Appellee's DNA profile that he analyzed from the first seizure of Appellee's DNA that the military judge had suppressed.

### 3. Authorization and Analysis of Appellee's Buccal Swabs

With the information from both affidavits, on 8 October 2019 the authorizing official found probable cause existed and approved search and seizure of Appellee's DNA. The next day, SA RD executed the search authorization and obtained two buccal swabs from Appellee and sent them to the USACIL where they were forensically analyzed.

Mr. MT again participated in the processing and analysis of Appellee's DNA. The results were reflected in a second report, dated 25 October 2019. Mr. MT examined vaginal swabs from A1C JL and identified the presence of male DNA from Appellee and SrA CG. Although the information had been suppressed, as part of his duties Mr. MT compared the information against Appellee's DNA profile obtained from the first swabs that had been suppressed, which were maintained in the USACIL database. He included the results of that comparison in his 25 October 2019 report that referenced the findings in his 15 March 2019 report.

### D. Defense Motion to Suppress and the Second Suppression Hearing

At trial, Appellee again moved to suppress admission of his DNA obtained from his buccal cells pursuant to a search authorization that he once more claimed was not founded on probable cause. The Defense argued in its written motion that SA RD recklessly omitted two crucial pieces of information from his affidavit. First, that A1C JL told the SANE that her clothing was on when she awoke to Appellee and that she did not recall details of the events that occurred, just that "it felt like [she] had sex." Second, that SA B provided a false affidavit to the commander for the same evidence SA RD was seeking to search and seize, and she did so in reckless disregard for the truth.

The Defense also argued that Mr. MT's affidavit was false because it stated A1C JL's vaginal swabs were determined to have DNA from an "unknown male individual" whom Mr. MT in fact knew to be Appellee because he was the same analyst who examined Appellee's DNA that was submitted to the USACIL pursuant to the first, invalidated search authorization. The Defense further argued as a basis for suppression that Mr. MT's affidavit failed to disclose his prior involvement in testing Appellee's DNA. The Defense claimed that the recklessly omitted information and false information rendered the second search authorization ineffectual because it lacked probable cause.

### 1. SA RD's Testimony

At the second suppression hearing, SA RD testified he knew evidence from the first DNA analysis was suppressed on grounds that SA B included inaccurate information in her affidavit. He explained he was not involved in completing her affidavit.

SA RD explained that he wrote the original draft of his affidavit and included actions he and SA B took between 3 and 7 February 2019 at the beginning of the investigation. He reviewed SA B's affidavit but did not rely on it before executing his own on 4 October 2019. He reviewed their recorded initial interview with A1C JL along with notes he took of her second interview. SA RD also reviewed their interview with SrA CG who was present in Appellee's apartment during the incident in question. He explained how he finalized his affidavit with the assistance of the legal office and did not recall anything they recommended he take out. He affirmed their revisions included "things that they added," which he reviewed and confirmed were accurate. He relayed he valued their legal opinion as regards probable cause from their knowledge of the case.

SA RD reviewed the SANE report the day after it was prepared before he gave it to SA B. On cross-examination he was asked by trial defense counsel if he agreed "that by not including the statement from the SANE from [A1C JL] saying that she was wearing clothing, that's not presenting the whole picture to the search authority if you omit that?" SA RD paused before replying that

he "really can't say," and explained he did not normally include information from SANE reports when seeking probable cause authorizations. SA RD ultimately agreed that leaving the information out did not present "the whole complete picture" to the authorizing official.

SA RD explained that even though his investigation was closed in October 2019, AFOSI was receptive to "going back to reopen the investigation" if the legal office thought there were "further investigative steps that needed to be done or should be done to support the case." SA RD testified to a hypothetical question that was put to him by the trial defense counsel. The AFOSI agent was told to assume Appellee was "out of this case altogether" and that SrA CG and A1C JL were alone in Appellee's apartment. Counsel then asked the agent if he would have sought DNA evidence to send to the USACIL for testing if A1C JL reported she "felt like [she] had sex," and SrA CG confessed to having sexual intercourse with her. SA RD answered he would still have accomplished DNA testing under those hypothetical circumstances for the purpose of corroborating the statements. The military judge asked if there were any cases where he had not sought DNA corroboration and the agent responded "maybe three or four times" out of "50 to 75 cases."

### 2. Mr. MT's Testimony

Mr. MT testified at the suppression hearing about the steps he took to process Appellee's buccal swabs and "that he did not do anything differently" the second time he tested Appellee's DNA. He explained that he "performed [his] tasks the way [the USACIL's] procedures are written and the way that [personnel at the USACIL] do it every time." The trial counsel asked if he relied on Appellee's buccal and penile swabs from the first analysis in conducting the second analysis. Mr. MT replied, "No. I did not."

He explained why his 25 October 2019 report nonetheless referenced his earlier, 15 March 2019, report: he explained that he was required to "reference back [to] that first report" because it was necessary for the USACIL's accreditation; he emphasized the laboratory "can't just simply ignore that [earlier report]. We have to state previous work was done in this case" in a subsequent report.

Mr. MT explained it is common practice for the USACIL to receive re-submission samples, also known as reference samples. When the USACIL receives reference samples, the laboratory will treat them as an unknown or "question" sample in determining whether the sample is a known contributor to other DNA profiles. Mr. MT never had to re-analyze samples for DNA analysis following a military judge's ruling to suppress DNA. He had never heard of anyone at the USACIL ever addressing the issue of re-analysis following a ruling to suppress DNA and was unsure of the protocol.

Mr. MT knew at the time he completed the affidavit that the unknown male was in fact Appellee. He nevertheless regarded Appellee's original reference sample as "unknown" and used this term in his report and his affidavit because the original reference sample was no longer valid for forensic analysis.[10] In his thinking, "it's as if that first one doesn't exist," and "has gone from being attributed to an individual to now it's an unknown." Because he could not validly attribute the contributing sample discovered in the analysis of A1C JL's vaginal swabs to Appellee, he attributed it to an "unknown male individual."

### E. Military Judge's Second Ruling Granting the Motion to Suppress

On 6 November 2019, the military judge granted Appellee's motion to suppress the second search and seizure of his DNA because the authorizing official who allowed the search was left without "the full picture of evidence and information" and, "like previously, the Government tried to pick and choose what facts to provide." The Government, she found, "knew how imperative it was to provide a complete picture to the [second] search authority" because "the Government had already had the previous search of [Appellee]'s DNA suppressed because of false statements [SA B] provided to the [first] search authority."

The military judge found the information relied on by the authorizing official to determine probable cause was incomplete and therefore misleading. The military judge found SA RD, like SA B, had "intentionally and recklessly" omitted information from his affidavit. Her findings focused on the AFOSI agent's failure to include four facts, only the first of which was raised by the Defense and contested at the suppression hearing: (1) that A1C JL told the SANE that she was clothed when she woke up at 0300; (2) that SrA CG disclosed to SA RD he observed Appellee and A1C JL were clothed when they came into the living room after being alone together in the spare bedroom for approximately 10 to 20 minutes; (3) that SrA CG admitted to having sex with A1C JL on the night in question in two separate AFOSI interviews, and not just the second interview on 7 February 2019 that SA RD references in his affidavit; and (4) that A1C JL told SA RD she was living with her ex-boyfriend during the time in question. SA RD was not questioned at the hearing about omissions (2) through (4).

---

[10] Mr. MT testified that he did not know Appellee's DNA obtained from penile swabs had been "suppressed," per se, when he completed the affidavit, but understood that "the oral swabs from the initial submission were no longer valid." The trial counsel asked, "So you didn't know it was suppressed. But you knew something happened in the court of law that now requires you to re-accomplish a second analysis?" Mr. MT acknowledged, "That's correct. Yes."

The military judge also took exception to the manner in which SA RD presented information in his affidavit. First, the military judge took issue with how SA RD composed his affidavit by separating two exculpatory facts: information that Appellee sent texts to A1C JL in which Appellee revealed she had sex with SrA CG and not with Appellee was not together with an admission the agents later obtained from SrA CG that he had sex with A1C JL on the night in question. Instead, SA RD presented this information in chronological order as he did with other investigative steps the AFOSI agents had taken.[11] Referencing the text messages, the military judge found that "[s]uch a statement in a vacuum could lead a search authority to believe the statement was not true, or the Accused was simply making an exculpatory statement." The military judge also took issue with SA RD's summary of his interview with A1C JL where he used bold and underlined text to emphasize his leading question to her, "Okay um was it just vaginal intercourse . . . ?" The military judge found this placed too great an emphasis on the "conclusory question" because SA RD's "assertion of vaginal intercourse is not a fact."

In addition to finding SA RD intentionally and recklessly omitted information, the military judge found Mr. MT failed to disclose to the authorizing official that he had previously tested Appellee's DNA. The military judge determined that Appellee met his burden to demonstrate that the inclusion of the facts SA RD omitted from his affidavit "would have extinguished probable cause." Her determination made it unnecessary to resolve whether, after setting aside Mr. MT's statement that the military judge found to be false—that his examination of vaginal swabs revealed DNA from an "unknown male individual" he knew was Appellee—the Government proved that the remaining information was sufficient to establish probable cause.

Further, the military judge ruled that the new DNA evidence was derivative of the initially tainted evidence she had suppressed. She explained the new request for Appellee's DNA "came only after the Court suppressed the first search and seizure," and the second authorization was based on information SA B and SA RD collected together. The military judge also relied on the fact that Mr. MT, who ran the original test of Appellee's DNA, wrote an affidavit in support of probable cause for the second authorization. Once Appellee's DNA was seized for the second time, it was sent to the same lab where it was analyzed by Mr. MT. The military judge found Mr. MT "conducted an independent analysis to compare [Appellee's DNA] to the previously submitted samples by

---

[11] SA RD's affidavit described sequentially the texts Appellee sent to A1C JL on 3 February 2019, the agents' interview of Appellee on 4 February 2019, and their second interviews of A1C JL and SrA CG on 5 February 2019 and 7 February 2019, respectively.

[A1C] JL and SrA [CG]." He then "generated a report that referenced back to the original report," and both reports relied on Appellee's penile swabs which had been suppressed. The military judge found, "While Mr. [MT] conducted an independent examination of [Appellee's] buccal swabs, the resulting test is certainly derivative of the first, as evidenced from [Mr. MT's] reference to the original test and its results in the report."

The military judge concluded the actions of SA RD and Mr. MT tainted the second authorization and rejected the Government's explanation that the October 2019 search affidavits contained only information SA RD and Mr. MT had lawfully obtained. The military judge also rejected the Government's contention that it "would have sent [A1C] JL's and SrA [CG]'s samples to be tested, even without the Accused's sample," and that "[w]hen the results came back showing the presence of a third individual,"[12] the Government would then have "collect[ed] the Accused's DNA at that point." The military judge gave four reasons why she found this line of reasoning flawed and ruled the October 2019 search did not originate from an independent source.

First, the military judge relied on the conclusion that there was simply no probable cause:

> But for the illegal search, the Government would not know the Accused's DNA was present on [A1C] JL's vaginal swabs. Because neither [A1C] JL nor SrA [CG] provide probable cause to believe a crime had been committed by the Accused, AFOSI would still not have probable cause to request a search authorization for the Accused's DNA. But for the previous illegal search and seizure identifying the Accused as a DNA contributor, nothing indicates the Accused and [A1C] JL were sexually intimate.

On this point the military judge was resolute that "information [A1C] JL and SrA [CG] provide[d] is not evidence of a crime." This is because "[A1C] JL still cannot say whether penetration occurred and SrA [CG] has no knowledge of whether penetration [by Appellee] occurred." To this end, the military judge found as fact that A1C JL "only reported an encounter with [Appellee] because she did not recall any sexual contact with [SrA CG] on the evening of 1–2 February 2019."

Second and related, the military judge found "[A1C] JL was in an intimate relationship with her ex-boyfriend at the time, which may provide an explanation for the third source of DNA." She concluded "it is speculative to believe the explanation for the third source of DNA would have been the Accused rather

---

[12] Or, a *second* male contributor to DNA found on A1C JL's vaginal swabs: one of the three DNA contributors was A1C JL.

than [an ex-boyfriend], with whom [A1C] JL was having an intimate relationship at the time of the charged offense."

Third, the military judge found "[t]here is no indication AFOSI was pursuing any leads through a means untainted by the illegality." The military judge found the "Government's decision to seek a new search authorization was prompted by the information gathered during the prior illegal search and only a result of having that search suppressed." The military judge reasoned, "[b]ut for the illegal search, the Government would not know the Accused's DNA was present on [A1C] JL's vaginal swabs."

Fourth, the military judge relied on the fact that "the new request for a search authorization came only after the Court suppressed the first search and seizure" of Appellee's DNA and "[t]he second search authorization was based on information collected by SA [B] and SA [RD] together." The military judge relied on the failure of the Government to "utilize a new, untainted investigator" and "a new, untainted analyst." The military judge concluded, "[i]nstead, the Government is attempting to try to get to the end they know exists, rather than starting with a fresh, untainted beginning."

Ultimately, the military judge concluded the exclusionary rule was appropriate. The military judge explained:[13]

> Finally, exclusion of the evidence will result in appreciable deterrence of future unlawful search and seizures; namely, reinforcing to investigators and legal offices the importance of accurately relaying information to the search authority. In this case, the conduct is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.

We disagree and find the military judge abused her discretion in suppressing the evidence by applying an erroneously heightened standard for probable cause and finding the evidence was not derived from an independent source as a matter of law.

## III. LAW

### A. Jurisdiction and Standard of Review for Article 62, UCMJ, Appeals

---

[13] The military judge concluded that the good faith exception to the exclusionary rule, *see generally* Mil. R. Evid. 311(c)(3), did not apply because of her finding that SA RD's "knowing and intentional" omission of facts from his affidavit was done "with reckless disregard for the truth."

We have jurisdiction to hear this appeal under Article 62(a)(1)(B), UCMJ, 10 U.S.C. § 862(a)(1)(B), which authorizes the Government to appeal "[a]n order or ruling which excludes evidence that is substantial proof of a fact material in the proceeding." Evidence that Appellee's DNA was recovered on the vaginal swabs from A1C JL's SAFE is substantial proof that Appellee penetrated A1C JL's vulva with his penis. Because penetration is an element of the charged offense, the presence of Appellee's DNA is substantial proof of a material fact in the proceeding.

When the Government appeals a ruling under Article 62, UCMJ, this court reviews the military judge's decision "directly and reviews the evidence in the light most favorable to the party which prevailed at trial." *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019) (citing *United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017)). Because this issue is before us pursuant to a Government appeal, we may act only with respect to matters of law. Article 62(b), UCMJ, 10 U.S.C. § 862(b). We may not make findings of fact, as we are limited to determining whether the military judge's factual findings are clearly erroneous or unsupported by the record. *United States v. Lincoln*, 42 M.J. 315, 320 (C.A.A.F. 1995). "When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are 'fairly supported by the record.'" *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004) (quoting *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985)).

**B. Fourth Amendment Legal Standards**

The Fourth Amendment demands "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[14] "[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" under the Fourth Amendment. *Maryland v. King*, 569 U.S. 435, 446 (2013); *see also Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 618 (1989) (blood, urine, and breath samples are searches for Fourth Amendment purposes); *see generally Schmerber v. California*, 384 U.S. 757, 770 (1966) ("Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned.").

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F.

---

[14] U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.").

2016) (citation omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *Gore*, 60 M.J. at 187 (citation omitted). This standard requires "more than a mere difference of opinion." *United States v. Buford*, 74 M.J. 98, 100 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

However, "[a] military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Seay*, 60 M.J. 73, 77 (C.A.A.F. 2004) (footnote omitted). An abuse of discretion occurs if the military judge's decision "is *influenced by an erroneous view of the law.*" *United States v. Cowgill*, 68 M.J. 388, 390 (C.A.A.F. 2010) (emphasis added) (quoting *United States v. Quintanilla*, 63 M.J. 29, 35 (C.A.A.F. 2006)). "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Martin*, 56 M.J. 97, 106 (C.A.A.F. 2001) (citation and internal quotation marks omitted).

### 1. Review of Search Authorizations

When reviewing a search authorization, we "do not review a probable cause determination de novo." *Hoffmann*, 75 M.J. at 125. Instead, we examine whether the person who authorized the search "had a substantial basis for concluding that probable cause existed." *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (quoting *United States v. Rogers*, 67 M.J. 162, 164–65 (C.A.A.F. 2009)). Great deference is given to the probable cause determination due to the Fourth Amendment's strong preference for searches conducted pursuant to a warrant. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citations omitted). Although a reviewing court's deference is "not boundless," *United States v. Leon*, 468 U.S. 897, 914 (1984), "courts should not invalidate warrants by interpreting affidavits in a hyper-technical, rather than a common sense, manner." *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001) (quoting *Gates*, 462 U.S. at 236).

### 2. Probable Cause

If the defense challenges evidence seized pursuant to a search authorization on the ground that the authorization was not based upon probable cause, "the prosecution has the burden of proving by a preponderance of the evidence that the evidence was not obtained as a result of an unlawful search or seizure." Mil. R. Evid. 311(d)(5)(A).

The Supreme Court stated in *Gates* that "[p]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considera-

tions of everyday life on which reasonable and prudent men, not legal technicians, act[.]'" 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Probable cause "requires more than bare suspicion, but something less than a preponderance of the evidence." *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007). It relies on a "common sense decision" based on the totality of the circumstances. *Cowgill*, 68 M.J. at 393 (C.A.A.F. 2010) (quoting *Leedy*, 65 M.J. at 213) (citations and internal quotation marks omitted). As the United States Court of Appeals for the Armed Forces (CAAF) explained in *Leedy*,

> Thus, the evidence presented in support of a search need not be sufficient to support a conviction, nor even to demonstrate that an investigator's belief is more likely true than false . . . ; there is no specific probability required, nor must the evidence lead one to believe that it is more probable than not that contraband will be present. . . . "The duty of the reviewing court is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."
>
> . . . [P]robable cause is founded not on the determinative features of any particular piece of evidence provided an issuing magistrate . . . but rather upon the overall effect or weight of all factors presented to the magistrate.

*Id.* at 213 (third alteration in original) (citations omitted).

### 3. False Information and Omissions

Military Rule of Evidence 311 addresses a motion to exclude evidence obtained from a search authorization that allegedly contains false information. The rule provides:

> *False Statements.* If the defense makes a substantial preliminary showing that a government agent included a false statement knowingly and intentionally or with reckless disregard for the truth in the information presented to the authorizing officer, and if the allegedly false statement is necessary to the finding of probable cause, the defense, upon request, shall be entitled to a hearing. At the hearing, the defense has the burden of establishing by a preponderance of the evidence the allegation of knowing and intentional falsity or reckless disregard for the truth. If the defense meets its burden, the prosecution has the burden of proving by a preponderance of the evidence, with the false information set aside, that the remaining information presented to

> the authorizing officer is sufficient to establish probable cause.
> If the prosecution does not meet its burden, the objection or mo-
> tion must be granted unless the search is otherwise lawful under
> these rules.

Mil. R. Evid. 311(d)(4)(B). This rule was adopted following *Franks v. Delaware*,
438 U.S. 154 (1978), in which the Supreme Court "expressed the view that the
best way to balance the need to protect the probable cause requirement with
society's interest in discovering the truth was to delimit the circumstances
where affidavits might be challenged." *Cowgill*, 68 M.J. at 391 (citing *Franks*,
438 U.S. at 165–71). "One explicit limitation was to allow review only in cases
where there is evidence of deliberate misstatements or reckless disregard for
the truth. 'Allegations of negligence or innocent mistake are insufficient.'" *Id.*
(quoting *Franks*, 438 U.S. at 171).

Although neither Mil. R. Evid. 311 nor *Franks* expressly extends to omis-
sions, the same general rationale for false statements extends to "material
omissions." *United States v. Mason*, 59 M.J. 416, 422 (C.A.A.F. 2004). "[E]ven
if a false statement or omission is included in an affidavit, the Fourth Amend-
ment is not violated if the affidavit would still show probable cause after such
falsehood or omission is redacted or corrected." *Id.* (quoting *Gallo*, 55 M.J. at
421).

Therefore, for an accused to be entitled to relief due to matters not pre-
sented to the magistrate, the accused "must demonstrate that the omissions
were *both* intentional or reckless, *and* that their hypothetical inclusion would
have prevented a finding of probable cause." *Mason*, 59 M.J. at 422 (citing
*United States v. Figueroa*, 35 M.J. 54, 56–57 (C.M.A. 1992)).

### 4. Independent Source Doctrine

Evidence obtained as the result of a Fourth Amendment violation must or-
dinarily be suppressed as if it were the proverbial "fruit of the poisonous tree."
*Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). Such evidence, like
the fruit, is cast aside and "generally not admissible at trial." *United States v.
Conklin*, 63 M.J. 333, 334 (C.A.A.F. 2006) (quoting *Nardone v. United States*,
308 U.S. 338, 341 (1939)).

When evidence is initially discovered during, or as a consequence of, an
unlawful search, however, it may still be admissible if it is later obtained inde-
pendently from activities untainted by the initial illegality. *See Murray v.
United States*, 487 U.S. 533, 537 (1988); *Silverthorne Lumber Co. v. United
States*, 251 U.S. 385, 392 (1920). The ultimate question is whether such evi-
dence is derived from a genuinely independent source. *Murray*, 487 U.S. at
542; *see generally United States v. Marine*, 51 M.J. 425 (C.A.A.F. 1999) (citing
*United States v. Williams*, 35 M.J. 323 (C.A.A.F. 1992) (rejecting "*per se* or 'but

for' rule")). The Government has the burden of proving by a preponderance of the evidence that the evidence it seeks to admit "would have been obtained even if the unlawful search or seizure had not been made." Mil. R. Evid. 311(d)(5)(A).

"The evil which the exclusionary rule is guarding against is the use of illegally obtained information to support a search warrant." *United States v. Moreno*, 23 M.J. 622, 625 (A.F.C.M.R. 1986) (citing *Wong Sun*, 371 U.S. at 471). "This goal of basing searches on untainted information is reached just as readily when the magistrate is given only information which was known before the illegal search as it is when the magistrate is given information which is discovered later, but from a different source." *Id.* This is because the independent source doctrine recognizes the exclusionary rule should put "the police in the same, not a worse, position than they would have been in if no police error had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984) (citations and footnote omitted).

## IV. DISCUSSION

The Government challenges the military judge's granting of Appellee's motion to suppress his DNA obtained from a buccal swab on 9 October 2019, which was again sent to the USACIL and forensically analyzed by Mr. MT. The Government asserts the military judge erred in granting the Defense's motion to suppress this evidence.

We analyze the military judge's conclusion that a corrected affidavit would not support a finding of probable cause as well as her conclusion that the second search was derivative of the first. Based on our resolution of these issues, our decision does not reach the applicability of the good faith exception to the exclusionary rule or the inevitable discovery doctrine, which the military judge found were unsupported by the evidence.

### A. Probable Cause

The military judge found "neither [A1C] JL nor SrA [CG] provide probable cause to believe a crime had been committed" and thus the Government did "not have probable cause to request a search authorization for the A[ppelee]'s DNA." We examine the information SA RD included in his affidavit and find that along with Mr. MT's affidavit, the military judge erred because the authorizing official "had a substantial basis for concluding that probable cause existed" to seize Appellee's DNA. *Nieto*, 76 M.J. at 105 (quoting *Rogers*, 67 M.J. at 164–65). Great deference is given to the probable cause determination, *Gates*, 462 U.S. at 236, and the military judge erred in not giving the deference that was due. Our examination of the affidavits lead us to conclude that the authorizing official could find probable cause based on the following:

SA RD averred A1C JL returned with Appellee and SrA CG to Appellee's apartment after a night of heavy drinking. Appellee expressed a sexual interest in A1C JL as evident by his suggestion to SrA CG that "something could happen," and asked SrA CG about having a threesome. Appellee reportedly nodded his head towards SrA CG and A1C JL as if to suggest they all should go into the spare bedroom to have sex. A1C JL reported to the AFOSI agents that she awoke two times during the night because she was interrupted by Appellee before leaving the spare bedroom to sleep on a couch in the living room.

The first time A1C JL awoke, she recalled Appellee was on top of her "trying to have sex," and was putting his face on her neck and touching her stomach. She positively identified Appellee by his appearance and voice. Although she was uncertain of her state of undress or whether penetration occurred, her suspicion that she may have been a victim of sexual assault was reinforced the second time she awoke: her next memory after awakening at 0300 was standing naked with Appellee—a man with whom she never before has been intimate—trying to get her to take a shower and he was angry when she refused. SA RD relayed A1C JL told the AFOSI agents she "was scared [Appellee] was trying to get rid of evidence that he had any sexual contact with [her]." Ultimately, A1C JL's suspicions were confirmed to some degree before SA RD sought search authorization for Appellee's DNA: the forensic medical examination and subsequent analysis by the USACIL revealed that A1C JL had semen from two men in her vagina. One of the men was SrA CG; the other man was yet unidentified.

We find the information provided to the search authorizing official supports a "fair probability" that seizure of Appellee's DNA would identify Appellee as the unidentified male contributor. *See Leedy*, 65 M.J. at 213. This is so even if SA RD properly conveyed A1C JL's uncertainty whether penetration occurred and if she was unclothed. *See United States v. Bethea*, 61 M.J. 184, 187 (C.A.A.F. 2005) (probable cause "does not demand any showing that such a belief be correct or more likely true than false"); *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999) ("[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark.").

The information A1C JL relayed to the AFOSI agents was enough because "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Id.* at 588. "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (quoting *Gates*, 462 U.S. at 243 n.13). Ap-

pellee's physical proximity to A1C JL and "trying to have sex" with her, followed by his anger when she refused to take a shower, resists Appellee's innocent explanation that he was looking for clothing as she slept and then tried to get her to take a shower because she spilled beer on herself earlier in the evening. A reasonable authorizing official could attach a degree of suspicion to Appellee's acts and properly order the seizure of Appellee's DNA to find evidence that Appellee was the second of two contributors of male DNA that was found in A1C JL's body.

With the issue of probable cause resolved, we nonetheless assume *arguendo* that SA RD recklessly or deliberately left information out of his affidavit as found by the military judge. Although the evidence of record raises questions about the military judge's factfinding, we need not decide whether her determination of SA RD's intent was clearly erroneous. Instead, the issue that resolves the matter is one of law which we review de novo:[15] whether it was an abuse of discretion for the military judge to find that inclusion of the omitted information in a corrected affidavit would have extinguished probable cause. *See Mason*, 59 M.J. at 422. We conclude that it was.

The military judge applied an erroneously heightened legal standard for probable cause, concluding the authorizing official was denied "the full picture of evidence and information." The military judge similarly erred finding the Government "knew how imperative it was to provide a *complete picture* to the search authority" as "the Government had already had the previous search of [Appellee]'s DNA suppressed because of false statements [SA B] provided to the search authority." (Emphasis added). The military judge abused her discretion because an affidavit is not required to include "every piece of information gathered in the course of an investigation." *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008) (quoting *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)); *see also United States v. Spinelli*, 393 U.S. 410, 419 (1969) ("[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."); *United States v. Montieth*, 662 F.3d 660, 665 (4th Cir. 2011) ("[T]o require that the affiant amass every piece of conceivable evidence before seeking a warrant is to misunderstand the burden of probable cause."). The proper test under the circumstances is not whether investigators provided the full and complete picture, but whether the omitted information was "material," *see Mason*, 59 M.J. at 422, that is, if it was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56.

---

[15] *See, e.g.*, *United States v. Leedy*, 65 M.J. 208, 212 (C.A.A.F. 2007) (citation omitted) ("[W]e review the legal question of sufficiency for finding probable cause de novo using a totality of the circumstances test.").

Using "the totality-of-the-circumstances analysis" authorized by *Gates*, 462 U.S. at 233, we find the military judge erred because the omitted information was not material or necessary, and a practical, common sense reading of a "corrected" October 2019 affidavit supports a "fair probability," *Leedy*, 65 M.J. at 213, that Appellee's DNA would match the unidentified DNA found on A1C JL's vaginal swabs, even with the inclusion of information that was left out. Guided by an incorrect view of the legal standard for probable cause, the military judge's ruling focused on four principal omissions that she found would have extinguished probable cause if the information had been presented to the search authorizing official.[16] We examine each omission in turn.

The first and most significant to the military judge was the finding that SA RD "failed to include [in his affidavit] that [A1C] JL told the SANE her clothing was on." Essential to this finding is the implicit finding that A1C JL awoke just once, and that Appellee was on top of her and she was wearing clothes when she did. However, when considered along with information in SA RD's affidavit, an alternative, even more likely, reading of the SANE report—captured in the nurse's words, not A1C JL's—is that A1C JL relayed waking up to two separate altercations with Appellee, and not just one: the SANE relays A1C JL's account of the shower incident at 0300 hours, then back in time to the sexual assault that preceded it, followed by a second reference to the shower incident when A1C JL recalled being clothed when she awoke, and then back in time again when A1C JL relates that she felt like she had sex.

The error in factfinding is not that the military judge's reading of the SANE report differs from our own, but the supposition that if SA RD had included the report in his affidavit, then the authorizing official would have reached the same conclusion as the military judge—that A1C JL's statement described waking up just once to altercations with Appellee and not twice. A1C JL told the nurse her clothing was on when she awoke at 0300; her next memory—as relayed to the AFOSI agents—was of Appellee trying to make her take a shower. That A1C JL may have been clothed later in the night just before the shower incident does little to discount her statements to the AFOSI agents that Appellee tried to have sex with her earlier as she slept when she was less certain if she was clothed. SA RD's affidavit prepared with the assistance of a judge advocate sufficiently captured A1C JL's fragmented and inconsistent

---

[16] The military judge did not make a finding that any of the omitted information was "material," per se. *See Mason*, 59 M.J. at 422. We assume for purposes of this appeal only, that the military judge erroneously reached the conclusion that it was; she found the omitted "information, if included, would have affected the search authority's finding of probable cause because it would have extinguished probable cause."

recollection about being clothed during the sexual assault.[17] SA RD's failure to include information that A1C JL relayed to the SANE was not consequential to determining probable cause, and thus, the military judge erred in finding that inclusion of the SANE's narrative would have extinguished probable cause.

Second, we examine SA RD's omissions that SrA CG disclosed to the AFOSI agents that he observed Appellee and A1C JL were clothed when they came into the living room after being alone together in the spare bedroom for approximately 10 to 20 minutes. The focus of the search authorizing official is what happened inside the spare bedroom when Appellee was alone with A1C JL, not what happened when they walked out. SrA CG's statements to the AFOSI agents have little bearing on what went on when Appellee and A1C JL were alone on this or any other occasion during the evening in question, just as A1C JL's state of dress when she left the bedroom has little to no bearing on whether she was vaginally penetrated without her consent.

Third, we examine SA RD's omission that SrA CG admitted to having sex with A1C JL on the night in question in two separate AFOSI interviews, and not just the second interview on 7 February 2019 that SA RD references in his affidavit. We find the cumulative inclusion of the same information twice was unnecessary and the omission did not diminish probable cause. An affiant is not required to include every piece of information gathered in the course of an investigation. *Tate*, 524 F.3d at 455 (citation omitted).

Lastly, we consider SA RD's omission that A1C JL mentioned that she lived with her ex-boyfriend during the incident in question when she was interviewed a second time by the AFOSI agents on 5 February 2019. The military judge relied on this information to find that probable cause to believe that Appellee was the second source of DNA found on A1C JL's vaginal swabs was lacking. We also consider this finding along with the ex-boyfriend's testimony at a closed hearing that was convened before SA RD prepared his affidavit. Despite the military judge's conclusion to the contrary, it does not follow that A1C JL's living with an ex-boyfriend with whom she was, on unspecified occasions, intimate, defeats probable cause. This is especially so because it was little more than conjecture to find that the ex-boyfriend could be the second of

---

[17] In her initial interview with the AFOSI agents, A1C JL "didn't even know if [she] had clothes on" and then recalled she "didn't have any clothes on" when Appellee tried to have sex with her. In a second interview, she recalled wearing a shirt, but was unsure if she also wore underwear or pants. This conflicting information relayed A1C JL's uncertainty about being clothed and was included in SA RD's affidavit given to the authorizing official.

two male contributors of DNA found in A1C JL's body. Thus, the military judge's finding is not fairly supported by the record.

We conclude that the hypothetical inclusion of the omitted information would not have prevented a finding of probable cause if it had been presented to the search authorizing official. *Mason*, 59 M.J. at 422. The totality of the circumstances establish probable cause and the military judge abused her discretion in finding otherwise.

## B. The Search and Seizure was not Derivative of Suppressed Evidence

The military judge also suppressed Appellee's DNA because she found the second search in October 2019 was derived from the first and, therefore, was fruit of the poisonous tree within the meaning of *Wong Sun*. The crux of her ruling is that military personnel—judge advocates and investigators alike—already knew Appellee's DNA was present on A1C JL's vaginal swabs when they went to seize it again, and so the second search was fouled by knowledge the Government acquired the first time it unlawfully obtained Appellee's DNA. Even so, we are convinced as a matter of law that the second search—approved by an authorizing official with no prior involvement or knowledge of evidence that had been suppressed—was not tainted or derivative of the first.

Because the record establishes the fruits of the first search were found to be unlawful and suppressed, the question to be resolved is whether the second search was "come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (citation omitted). Evidence is not excluded where the connection between unlawful government conduct and discovery and seizure of evidence is "so attenuated as to dissipate the taint." *Nardone*, 308 U.S. at 341. The "fruit of the poisonous tree" doctrine has no application when the Government learns about evidence from an independent source. *Wong Sun*, 371 U.S. at 487–88. The ultimate question is whether such evidence is derived from a genuinely independent source. *Murray*, 487 U.S. at 542.

We find the military judge abused her discretion in finding the seizure of Appellee's DNA in October 2019 was not independent of knowledge the Government acquired from the first seizure in February that she suppressed. Upon receipt of her first ruling, military personnel were aware of faults in the first authorization. The flaws were not founded in the legality by which the AFOSI agents obtained DNA from A1C JL and SrA CG or statements from witnesses, but in SA B's misrepresentation of facts to the first authorizing official who relied on them to find probable cause. The military judge found "the Government's decision to seek a new search authorization" was prompted, *inter alia*,

by "having that [first] search suppressed."[18] However, it was an erroneous view of the law to conclude that military personnel, prompted by her adverse ruling on challenged evidence, exploited the initial illegality. This is so because the independent source doctrine recognizes the exclusionary rule should put "the police in the same, not a *worse*, position than they would have been in if no police error had occurred." *Nix*, 467 U.S. at 443; *see also Murray*, 487 U.S. at 541 ("Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." (citing *Nix*, 467 U.S. at 443)). The facts SA B had misrepresented, and the authorizing official who relied on them, played no part in the investigation after the military judge granted Appellee's first motion to suppress.

Consequently, the information in SA RD's affidavit that the Government relies on in support of the second authorization is not tainted, and the military judge's finding to the contrary is clearly erroneous. Military personnel had untainted knowledge that A1C JL's vaginal swabs included semen from an unidentified male contributor in addition to SrA CG whose semen was found in her vagina. During their investigation, SA B and SA RD determined that the only men who were present in Appellee's apartment while A1C JL was passed out drunk and asleep were Appellee and SrA CG. As previously described, Appellee had shown a sexual interest in A1C JL in his living room, and his conduct when he was alone with her in the spare bedroom and when she was naked in the bathroom was not above suspicion. A1C JL awoke to someone trying to have sex with her; she identified that person as Appellee from his voice and face; she was concerned about what to do if she was pregnant "with him;" she wanted a rape kit but was unfamiliar with the medical care she could receive from TRICARE; and then she reported Appellee's possible sexual assault to her first sergeant.

On these facts, it cannot be said that the Government exploited any illegality by pursuing a second search authorization that was independent of SA B's misrepresentations that initially resulted in suppression. *See Wong Sun*, 371 U.S. at 488. The military judge reached the opposite conclusion, erroneously finding the Government failed to use an "untainted investigator" and an "untainted analyst." We consider each finding in turn.

The military judge erroneously concluded SA B's earlier actions tainted SA RD. The military judge regarded SA B as though the agent herself was tainted,

---

[18] The military judge's conclusion that AFOSI agents were not "pursuing any leads through a means untainted by the illegality" is inapposite as it was judge advocates and not investigators who were working to determine the next steps. Government attorneys, not AFOSI special agents, spearheaded the effort that caused SA RD to reopen the closed AFOSI investigation and seek a second authorization untainted by the first.

relying on the finding that "[t]he second search authorization was based on information collected by SA [B] and SA [RD] together." However, SA B alone misinformed the first authorizing official and the information SA RD relayed in his affidavit is independent of the initial illegality. The shortcoming of the first search was the misinformation SA B relayed to the first authorizing official, none of which SA RD repeated in his own affidavit. Thus, the military judge clearly erred in finding SA B's actions tainted SA RD.

As found by the military judge, upon receiving Appellee's DNA in buccal swabs that were obtained from the second authorization, Mr. MT "conducted an independent analysis to compare it to the previously submitted samples by [A1C] JL and SrA [CG]." He then "generated a report that referenced back to the original report," and both reports relied on information that was suppressed. The military judge found, "While Mr. [MT] conducted an independent examination of the buccal swabs, the resulting test is certainly derivative of the first, as evidenced from the reference to the original test and its results in the report." The military judge's finding as to the derivative nature of the "resulting test" is clearly erroneous because the military judge failed to properly distinguish Mr. MT's untainted, independent analysis on the one hand from the later report he prepared on the other. Even though his 25 October 2019 report improperly compared untainted information against the first analysis of Appellee's DNA, which was maintained in the USACIL database and had been suppressed, it does not follow that the analysis that the military judge found to be "independent" was tainted by Mr. MT's subsequent action in preparing his report. The military judge clearly erred in finding Mr. MT's second analysis of Appellee's DNA was derived from the first and thus tainted.

Contrary to the military judge's factfinding, there is no evidence in the record that government attorneys or investigators sought to exploit SA B's misinformation or their knowledge that Appellee's DNA was present on A1C JL's vaginal swabs because of it. By pursuing the second authorization military personnel were simply starting anew "by means sufficiently distinguishable to be purged of the primary taint." *Id.* (citation omitted). The operative facts in SA RD's and Mr. MT's affidavits were all in the possession of the authorities before the fruit of the first search authorization that was suppressed, and those facts constitute probable cause to support the second authorization. Appellee's Fourth Amendment rights were protected by the independent source requirement for obtaining a second search authorization. Ultimately, evidence from the analysis of Appellee's DNA came into the hands of the Government lawfully and was independent of information obtained from the first seizure that the military judge suppressed.

The Government proved by a preponderance of the evidence that it pursued admissible, forensically-sound evidence to determine if Appellee could be the

source of the unidentified male DNA, and its pursuit was irrespective of information derived from the February 2019 buccal and penile swabs that were suppressed. Mil. R. Evid. 311(d)(5)(A) (the prosecution has the burden of proving evidence was not obtained as a result of an unlawful search or seizure). We are convinced the October 2019 seizure of Appellee's DNA is genuinely independent of the knowledge military personnel acquired from the suppression of the earlier seizure of his DNA. *See Murray*, 487 U.S. at 542. The military judge abused her discretion in finding otherwise.[19]

## V. CONCLUSION

The appeal of the United States under Article 62, UCMJ, is **GRANTED**. The military judge's ruling to grant the defense motion to suppress evidence of Appellee's DNA seized by the Government on 9 October 2019 is **REVERSED**. The record is returned to The Judge Advocate General for remand to the military judge for action consistent with this opinion.[20]

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[19] Further, we note that suppression contravenes the exclusionary rule's purpose of ensuring the benefits of appreciable deterrence of future unlawful searches or seizures outweigh the costs to the justice system. Mil. R. Evid. 311(a)(3). This purpose can be assured by placing the Government and Appellee in the same positions they would have been in had the impermissible conduct not taken place. This is because the independent source doctrine recognizes the exclusionary rule should put "the police in the same, not a *worse*, position than they would have been in if no police error had occurred." *Nix*, 467 U.S. at 443.

[20] Our decision does not undertake to resolve the admissibility of specific areas of testimony of a witness or a particular report.